ARMSTRONG v YPSILANTI CHARTER TOWNSHIP

Docket No. 222924. Submitted June 6, 2001, at Lansing. Decided December 7, 2001, at 9:05 A.M.

Duke L. Armstrong brought an action in the Washtenaw Circuit Court against Ypsilanti Charter Township and five individual members of the township board, asserting various claims for damages resulting from the individual defendants' votes to pass a motion that eliminated the line-item funding for the plaintiff's position as administrative assistant to the township supervisor. The elected township supervisor, who is the sixth member of the township board, voted against the motion. The court, Donald E. Shelton, J., denied the plaintiff's motion to disqualify the trial judge, and the chief judge of the circuit court, Timothy P. Connors, affirmed that denial. The court entered a judgment and order granting summary disposition in favor of the defendants on several grounds. The plaintiff appealed, and the individual defendants cross appealed from the denial of their motion to quash the plaintiff's first amended complaint.

The Court of Appeals *held:*

1. The separation of powers doctrine contained in Const 1963, art 3, § 2 applies to state government only and does not apply to township government.

2. Section 9 of the Charter Township Act, MCL 42.9, allows a township board to abolish any position within township government as long as the position is not the offices of the township clerk or the township treasurer. The plaintiff's position may be abolished by the township board.

3. MCL 42.9 does not requires the township supervisor's recommendation before a position may be abolished by the township board.

4. The Charter Township Act gives the township board full and absolute control over the township budget and does not provide that the board can reduce appropriations only when there has been a reduction in income.

5. The court properly dismissed the plaintiff's tort claims against the individual defendants on the basis that the defendants were

protected from liability by governmental immunity provided by state and federal law.

6. The court's ruling on the motions for summary disposition did not evidence deep-seated favoritism or antagonism toward the plaintiff that would support the plaintiff's claim of actual bias.

7. The trial judge had no economic, pecuniary, or other financial ties to the individual defendants. There were no grounds to support the motion to disqualify the trial judge.

Affirmed.

1. TOWNSHIPS — CONSTITUTIONAL LAW — SEPARATION OF POWERS.

The separation of powers doctrine in Const 1963, art 3, § 2 applies to state government only, not to local municipal or township government.

2. TOWNSHIPS — CHARTER TOWNSHIP BOARDS.

Section 9 of the Charter Township Act allows a township board to abolish any position within the township government other than the township clerk and the township treasurer; the township supervisor's recommendation is not required before a position may be abolished by the township board (MCL 42.9).

3. TOWNSHIPS — CHARTER TOWNSHIP BOARDS.

A charter township board has full and absolute control over the township's budget and may reduce appropriations without a showing that there has been a reduction in income (MCL 42.27, 42.28, 42.29).

4. JUDGES — DISQUALIFICATION.

Judicial rulings, in and of themselves, generally do not constitute a valid basis for a motion alleging judicial bias unless the rulings display a deep-seated favoritism or antagonism that would make fair judgment impossible and overcome the heavy presumption of judicial impartiality.

*Jeffrey A. McKeever, P.L.C.* (by *Jeffrey A. McKeever*), for the plaintiff.

*Garan Lucow Miller, P.C.* (by *Rosalind Rochkind* and *Thomas F. Myers*), for the defendants.

Amicus Curiae:

*Bauckham, Sparks, Rolfe, Lohrstorfer & Thall, P.C.* (by *John H. Bauckham*), for the Michigan Townships Association.

Before: HOOD, P.J., and WHITBECK and METER, JJ.

PER CURIAM. Plaintiff Duke Armstrong appeals the trial court's order granting summary disposition to defendants Ypsilanti Charter Township, Ruth Jamnick, Brenda Stumbo, Darcus Sizemore, Karen Lovejoy-Roe, and William Gagnon. Armstrong also challenges the trial court's denial of his motion to disqualify the trial judge and the later order of the chief judge affirming that denial. Jamnick, Stumbo, Sizemore, Lovejoy-Roe, and Gagnon cross appeal the trial court's denial of their motion to quash Armstrong's first amended complaint. We affirm.

### I. BASIC FACTS AND PROCEDURAL HISTORY

#### A. OVERVIEW

Ypsilanti Township is a charter township, organized under the Charter Township Act.[1] Jamnick, Stumbo, Sizemore, Lovejoy-Roe, and Gagnon are all members of the township board. A sixth member of the township board, although not a defendant here, Wesley Prater, was the elected township supervisor. Armstrong had served as Prater's administrative assistant since 1991, but on May 30, 1996, the township board, with only Prater voting against the motion, eliminated the line-item funding for Armstrong's administrative assistant position, thereby effectively eliminating his job. It is undisputed that the elimination of the line-

---

[1] MCL 42.1 *et seq.*

item funding was not part of the normal budgetary cycle; rather it occurred during, instead of before or at the commencement of, the township's fiscal year.

### B. ARMSTRONG'S COMPLAINT

Armstrong's first amended complaint contained thirteen counts. Count I asserted a claim based on defamation against the board members. Count II asserted a claim based on violation of the Michigan Handicappers' Civil Rights Act.[2] Armstrong claimed that he had been diagnosed with "stress reaction," which required a temporary medical leave. Count III asserted a violation of the Michigan Civil Rights Act.[3] Armstrong claimed that his age was at least one factor in the decision to terminate his employment. Count IV asserted a violation of the National Labor Relations Act.[4] Armstrong claimed that his involvement in the attempted organization of his fellow employees in a labor union was at least one factor in the decision to terminate his employment. Count V was a claim of breach of an implied employment contract. Armstrong claimed that the township's management made statements to him and other employees that it was the township's policy not to discharge employees as long as the employees performed their jobs. Count VI asserted wrongful discharge contrary to public policy. Armstrong claimed that during his employment, the township established policies and procedures that created a legitimate expectation that

---

[2] Now called the Persons with Disabilities Civil Rights Act, MCL 37.1101 *et seq.*

[3] MCL 37.2101 *et seq.*

[4] 29 USC 157 and 158.

his employment could be terminated only for just cause. Count VII asserted interference with a business relationship. Armstrong claimed that the board members interfered with his business relationship with the township, which relationship had a reasonable likelihood of future economic benefit to him. Count VIII asserted the board members were grossly negligent concerning their conduct and treatment of Armstrong, including alleged false accusations and statements made by the board members concerning him. Count IX was a claim of intentional infliction of emotional distress concerning defendants' conduct and treatment of Armstrong during his employment. Count X asserted violation of Armstrong's constitutional rights.[5] Armstrong claimed that, before his employment was terminated, he engaged in constitutionally protected speech on a matter of public concern by speaking with administrative assistants of various departments regarding forming a union and that his exercise of his constitutional rights was one reason for the termination of his employment. Count XI asserted a separate violation of Armstrong's constitutional rights.[6] Armstrong claimed that, before depriving him of his constitutionally protected property interest in continued employment, defendants did not conduct a hearing or otherwise afford him either notice of the grounds for the termination of his employment or a meaningful opportunity to respond. Count XII asserted a violation of the Michigan Constitution with respect to due process and fair treatment in investigations. Armstrong claimed that defendants

---

[5] US Const, Ams I and XIV; 42 USC 1983.

[6] US Const, Am XIV (due process); 42 USC 1983.

failed to adequately investigate the facts and circumstances surrounding alleged false accusations.[7] Count XIII was a conspiracy claim. Armstrong contended that the tortious conduct asserted in the complaint was done in concert by the board members in order to violate his legal and constitutional rights.

In mid-March 1999, the township moved for summary disposition pursuant to MCR 2.116(C)(7), (8), and (10). In early April, the trial court held a hearing on this motion but delayed ruling until a final decision was made on the judicial disqualification matter hereinafter outlined. In late April 1999, the board members filed a motion for summary disposition pursuant to MCR 2.116(C)(7) and (8). In early June 1999, the trial court held a hearing on this motion and took the matter under advisement.

### C. THE TRIAL COURT'S RULING

The trial court addressed and granted both motions for summary disposition in an order and opinion entered on September 29, 1999, stating:

> Plaintiff . . . alleges that defendants wrongfully eliminated funding for the Administrative Assistant to the Ypsilanti Township Supervisor, a position which plaintiff held. The four individual defendants were Township board members who voted for the resolution. . . .
>
> *          *          *
>
> For his claim against the township, plaintiff argues that the Township Supervisor position is analogous to that of a chief executive position and that [the] board's action to eliminate funding thereby violates the separation of powers

---

[7] Const 1963, art 1, § 17.

doctrine. He urges the Court to find that the Supervisor is the chief executive with the exclusive authority to abolish plaintiff's position.

The Township of Ypsilanti has adopted the Charter Township Act ("the Act"). Pursuant to that Act, all legislative authority and powers of the township are vested in the township board. MCL 42.5(1). [At this point, the trial court quoted MCL 42.5 and MCL 42.9.]

Plaintiff asserts that this section of the statute only allows the board to *create* a position and does not explicitly grant the board authority to *abolish* a position. Plaintiff further claims that even if this section is construed to confer authority to abolish a position on the board, that authority would only concomitantly arise at the township supervisor's recommendation. Plaintiff argues that since in this case the supervisor voted against the elimination of the funding for plaintiff's position, the board had no authority to do so.

The construction of the statute urged by plaintiff is without merit. The legislature clearly provides . . . that the entire elected township board, which by definition includes the supervisor, has the authority to create employment positions at taxpayer expense. That authority is not conferred by the statute on the supervisor. Inherent in the board's authority to create such a position is its authority to abolish it.

The ensuing sentence in this section of the Act fortifies the interpretation that the board has the power to abolish employment positions in the township. That sentence expressly states that the board may not "abolish" the offices of township clerk or treasurer. The express designation of the offices of township clerk and township treasurer as offices that may not be abolished by the township board is recognition that the legislature intended that the board has the power to abolish other positions not so designated. . . .

Plaintiff also claims that the board's role is to check the power of the supervisor by approving a budget that includes the appropriation of funds for the supervisor's use. He claims that when [the] board eliminated funding for plaintiff's position, the board encroached on the executive's authority. On the contrary, it is the board that has the

exclusive authority over budget, appropriation and expenditure for a township under the Act. MCL 42.27, 42.28. There was no usurpation of supervisor authority by the actions of the board in this case.

As to plaintiff's tort claims against the individual board members, the defendants assert that they are immune from plaintiff's tort claims under Michigan law. The highest elective officials of all levels of government are immune from tort liability when acting within their authority. *Ross v Consumers Power Co (On Rehearing)*, 420 Mich 567, 633 (1984). The same was codified in 1986 [at this point, the trial court quoted MCL 691.1407(5)].

These defendants are clearly the highest elective officials in the township and are immune if they were acting within their authority when they eliminated plaintiff's position.

\*          \*          \*

. . . As indicated by the analysis of the board's actions above, the legislature gave the board *as a whole* the authority to create, combine, *and abolish* administrative offices as set forth in MCL 42.9. The actions of the individual trustees were therefore within their legislative authority and they are immune from plaintiff's tort actions by virtue of MCL 691.1407(5).

### D. DISQUALIFICATION OF THE TRIAL COURT

The trial court record does not contain a motion to disqualify the judge, but the record does reflect that a hearing was held on such a motion on April 7, 1999. At the hearing, the following discussion ensued:

*Mr. McKeever [plaintiff's counsel]*: Judge, as we just mentioned at the bench, I found out yesterday that I think four of the individually named defendants were involved with— as well as Mr. Winters was involved in setting up fundraisers for Your Honor, as well as selling tickets and what have you. And because of those facts—

*The Court:* You mean when I ran for the Supreme Court [in 1996]?

*Mr. McKeever:* That's right, Judge. And I just—as I mentioned at the bench, due to those facts, at my client's request, I bring this motion for Your Honor to disqualify himself. And as I mentioned previously, I certainly mean no disrespect, Judge.

Armstrong submitted his own affidavit, which asserted that the board members "participated in raising election funds for the Honorable Donald E. Shelton." The trial court denied Armstrong's motion for disqualification from the bench and stated:

Well, there were a number of people, obviously, who were kind enough to assist in the campaign when I ran for the Supreme Court. But, to my knowledge, the successful candidates do not disqualify themselves from hearing cases in which contributors to their campaigns were involved, nor do I think that I'm required to do so, nor do I think it would be appropriate to punish people for participating in the process in that way.

More importantly—so I'm going to deny the motion on the basis of any economic interest. More importantly is the question of whether I have any bias in favor of the defendants. I would gather that, if the Township of Ypsilanti were to—or its officials were to take a vote on whether I was generally in favor of them or generally against them in terms of my rulings, it would be a close issue. It probably would be a divided vote, and as it should be.

I have not—I don't have—I don't hesitate in my rulings to rule against the local governments or their elected officials when I think that justice of the cause requires that. And I would expect that the township officials in this township as well as other municipal bodies would, with chagrin, agree with that.

So I'm going to deny the motion to disqualify. If you would like to appeal that before we take up other matters, you can take it to the chief judge.

Shortly thereafter, the chief judge of the circuit court held a hearing to review the trial court's decision to deny the motion for disqualification, ruling:

> You have to show actual bias or prejudice. Again, you know, this is—I think the only way you're ever going to avoid this is if you go to something like the Missouri plan. And I'm not saying that's necessarily the best way, either, because there's arguments that, then, you don't have accountability to the general public.
>
> So there's countervailing public policy reasons to go the way that we are. But as long as we have this system, you're going to have contributors and you're going to have people who don't contribute. And the logical extension of your argument is, literally, be—I mean, we might have just a few lawyers left practicing.
>
> And I don't think you've been able to demonstrate, sir, based on that record, that there's actual bias or prejudice; and, therefore, the appeal of Judge Shelton's decision to me—the appeal is denied. His decision is affirmed. He's in the best position to say whether his relationship is such that he would not be able to do that.

## II. SUMMARY DISPOSITION

### A. STANDARD OF REVIEW

This Court reviews de novo rulings on motions for summary disposition.[8] Statutory interpretation is a question of law that we review de novo.[9] We also review constitutional issues de novo.[10] Whether there has been a violation of the separation of powers doc-

---

[8] *Van v Zahorik*, 460 Mich 320, 326; 597 NW2d 15 (1999).

[9] *Rose Hill Center, Inc v Holly Twp*, 224 Mich App 28, 32; 568 NW2d 332 (1997).

[10] *In re Juvenile Commitment Costs*, 240 Mich App 420, 440; 613 NW2d 348 (2000).

trine is a question of law, which we also review de novo.[11]

### (1) MCR 2.116(C)(7)

MCR 2.116(C)(7) provides, in part, that summary disposition is appropriate when a claim is barred because of immunity granted by law. In reviewing a motion for summary disposition under MCR 2.116(C)(7), this Court accepts a plaintiff's well-pleaded allegations as true and construes them in a light most favorable to the plaintiff.[12] In determining whether a plaintiff's claim is barred by governmental immunity, this Court must consider all documentary evidence, including any pleadings, depositions, admissions, or any other documentary evidence submitted by the parties.[13] In order to survive a motion for summary disposition under MCR 2.116(C)(7), a plaintiff is required to allege facts in the complaint that justify application " 'of an exception to governmental immunity.' "[14]

### (2) MCR 2.116(C)(8)

MCR 2.116(C)(8) provides for summary disposition of a claim on the ground that the opposing party has failed to state a claim on which relief can be granted. A motion under MCR 2.116(C)(8) tests the legal suffi-

---

[11] *Hopkins v Parole Bd,* 237 Mich App 629, 635; 604 NW2d 686 (1999).

[12] *Fante v Stepek,* 219 Mich App 319, 321-322; 556 NW2d 168 (1996).

[13] *Suttles v Dep't of Transportation,* 457 Mich 635, 642; 578 NW2d 295 (1998).

[14] *Id.,* quoting *Wade v Dep't of Corrections,* 439 Mich 158, 163; 483 NW2d 26 (1992).

ciency of a claim by the pleadings alone and all factual allegations contained in the complaint must be accepted as true[15] as well as any reasonable inferences or conclusions that can be drawn from the facts.[16]

### (3) MCR 2.116(C)(10)

MCR 2.116(C)(10) provides for summary disposition where there is no genuine issue regarding any material fact and the moving party is entitled to judgment or partial judgment as a matter of law. The Michigan Supreme Court has held that a trial court " 'may grant a motion for summary disposition under MCR 2.116(C)(10) if the affidavits or other documentary evidence show that there is no genuine issue in respect to any material fact, and the moving party is entitled to judgment as a matter of law.' "[17] In addition, all affidavits, pleadings, depositions, admissions, and other documentary evidence filed in the action or submitted by the parties is viewed "in the light most favorable to the party opposing the motion."[18]

### C. ARMSTRONG'S ISSUES ON APPEAL

Armstrong's appeal requires us to address three separate, but interrelated, issues. The first issue is whether defendants' actions violated the separation of powers doctrine. The second issue is whether

---

[15] *Simko v Blake*, 448 Mich 648, 654; 532 NW2d 842 (1995).

[16] *Smith v Stolberg*, 231 Mich App 256, 258; 586 NW2d 103 (1998).

[17] *Smith v Globe Life Ins Co*, 460 Mich 446, 454; 597 NW2d 28 (1999), quoting *Quinto v Cross & Peters Co*, 451 Mich 358, 362; 547 NW2d 314 (1996).

[18] *Quinto, supra* at 362.

defendants' actions violated the Charter Township Act. The third issue is whether defendants were protected by governmental immunity. We will address each of these issues.

### D. SEPARATION OF POWERS

#### (1) THE SEPARATION OF POWERS DOCTRINE

In *Hopkins*, this Court, discussing the separation of powers doctrine, stated:

> The Michigan Constitution provides for the separation of the three branches of government as follows:
>
> "The powers of government are divided into three branches: legislative, executive and judicial. No person exercising powers of one branch shall exercise powers properly belonging to another branch except as expressly provided in this constitution."[19]
>
> This separation of powers intends to preserve the independence of the three branches of government. *In re 1976 PA 267*, 400 Mich 660, 662; 255 NW2d 635 (1977). " '[W]here the *whole* power of one department is exercised by the same hands which possess the *whole* power of another department, the fundamental principles of a free constitution are subverted.' " *Soap & Detergent Ass'n v Natural Resources Comm*, 415 Mich 728, 752; 330 NW2d 346 (1982) (emphasis in original), quoting The Federalist No. 47 (J. Madison). The separation of powers doctrine does not, however, require so strict a separation as to provide no overlap of responsibilities and powers. *Judicial Attorneys Ass'n v Michigan*, 459 Mich 291, 296; 586 NW2d 894 (1998). If the grant of authority to one branch is limited and specific and does not create encroachment or aggrandizement of one branch at the expense of the other, a sharing of power may be constitutionally permissible. *Id.* at 296-297; *Mayor of City of Detroit v Michigan*, 228 Mich App 386,

---

[19] Const 1963, art 3, § 2.

410-411; 579 NW2d 378 (1998), vacated in part on other grounds *Judicial Attorneys Ass'n v Michigan,* 460 Mich 590; 597 NW2d 113 (1999).[20]

### (2) APPLICATION OF THE SEPARATION OF POWERS DOCTRINE TO TOWNSHIP GOVERNMENT

Here, the specific question is whether the separation of powers doctrine applies to township government. The Michigan Supreme Court conclusively answered this question in *Rental Property Owners Ass'n of Kent Co v Grand Rapids,*[21] stating:

Const 1963, art 3, § 2, incorporates the separation of powers doctrine into the Michigan Constitution. . . .

In *Detroit Osteopathic Hosp v Southfield,* 377 Mich 128; 139 NW2d 728 (1966), we declined to answer whether art 3, § 2 applies only to state government, or whether it applies to local government as well. Both the context and history of the provision demonstrate that the provision *applies only to state government.*

The context of art 3, § 2 suggests that the provision applies only to state government and not to local government. The other sections of article 3 strongly suggest that the term "government" in art 3, § 2 is only intended to include state government. Art 3, § 1 states that "[t]he seat of government shall be at Lansing." Obviously, the term "government" in this section refers only to state, and not local, government.

Furthermore, the history of municipal government in this state suggests that the provision does not apply to localities. Municipal government in Michigan typically has not been divided among three branches of government. Under the city manager form of government, popular among

---

[20] *Hopkins, supra* at 635-636.

[21] *Rental Property Owners Ass'n of Kent Co v Grand Rapids,* 455 Mich 246, 266-268; 566 NW2d 514 (1997) (emphasis supplied, paragraph structure altered).

smaller cites, the executive, the city manager, serves at the will of the legislature, the city commission. The home rule cities act explicitly allows this blending of legislative and executive functions, stating, "The city charter may provide for the selection of the mayor by the legislative body." MCL 117.3(a); MSA 5.2073(a). This Court has recognized that legislative bodies of local governments may also exercise executive powers. *Wayne Co Jail Inmates v Wayne Co Sheriff*, 391 Mich 359; 216 NW2d 910 (1974). Further, this Court has recognized that the legislative bodies of municipalities can operate as administrative tribunals. *Bundo v Walled Lake*, 395 Mich 679, 696-697; 238 NW2d 154 (1976).

### (3) PROVISIONS OF THE CHARTER TOWNSHIP ACT

Undeniably, in light of *Rental Property Owners*, the separation of powers doctrine does not apply to a municipality like Ypsilanti Township.

We would arrive at this conclusion even without the Supreme Court's guidance in *Rental Property Owners*. Even the Charter Township Act indicates that township government is *not* divided among three branches of government:

(1) Except as otherwise provided in this act, all legislative authority and powers of each charter township shall be vested in and shall be exercised and determined by a township board of 7 members composed of the supervisor, the township clerk, the township treasurer, and 4 trustees who shall be electors in the township. . . .

(2) . . . As a member of the township board, the supervisor shall be the presiding and executive officer of the board and shall have an equal voice and vote in the proceedings of the board.[22]

---

[22] MCL 42.5.

Therefore, a charter township is made up of a legislative "branch" only and does not include an executive "branch." As the Michigan Townships Association puts it in its helpful amicus curiae brief, "townships are a unique form of government in which there is no clear separation of executive and legislative powers between elected officials." Accordingly, a township supervisor, despite the use of the term "executive officer" in the Charter Township Act, is simply the leader within the legislative township board, having voting power equal to any other board member. Rather clearly, we believe, when the Legislature used the term "executive officer" in the Charter Township Act, it did so in relationship to the township board, itself a legislative body. In light of this situation and the Court's decision in *Rental Properties Ass'n*, we conclude that the separation of powers doctrine has no applicability in this case.

## E. THE CHARTER TOWNSHIP ACT

### (1) PRINCIPLES OF STATUTORY CONSTRUCTION

In *Rose Hill Center, Inc v Holly Twp*,[23] this Court explained the longstanding rules of statutory construction:

The primary goal of statutory interpretation is to ascertain and give effect to the intent of the Legislature in enacting a provision. Statutory language should be construed reasonably, keeping in mind the purpose of the statute. The first criterion in determining intent is the specific language of the statute. If the statutory language is clear and unambiguous, judicial construction is neither required nor per-

---

[23] *Rose Hill Center, supra* at 32 (citations omitted).

mitted, and courts must apply the statute as written. However, if reasonable minds can differ regarding the meaning of a statute, judicial construction is appropriate.

Statutes should be construed so as to prevent absurd results, injustice, or prejudice to the interests of the public.[24]

### (2) ABOLISHING A POSITION UNDER THE CHARTER TOWNSHIP ACT

The Charter Township Act provides for the creation of charter townships and the rules by which charter townships must operate. MCL 42.9 provides in pertinent part:

> The township board may, by resolution, upon the recommendation of the supervisor, or of the township superintendent if one shall be appointed, create such additional officers as may be necessary to administer the affairs of the township government, or may combine any administrative offices in any manner not inconsistent with state law, and prescribe the duties thereof. No creation of any additional administrative office or combination thereof shall abolish the offices of township clerk or township treasurer nor diminish any of the duties or responsibilities of those offices which are prescribed by state law.

Armstrong argues that MCL 42.9 provides township board members with the authority to act *only* at the recommendation of the township supervisor and, therefore, does not give the township board the authority to abolish a position. We disagree. We conclude that MCL 42.9 allows a township board to abolish a position and that any other reading of the statute would be absurd. Clearly, the township board has

---

[24] *Camden v Kaufman*, 240 Mich App 389, 395; 613 NW2d 335 (2000).

the authority to *create* positions within the township government. The statute is merely silent with respect to abolishing administrative positions. However, the fact that MCL 42.9 specifically denies a township board the authority to abolish the offices of township clerk and township treasurer indicates that other offices *can* be abolished. In *People v Jahner*,[25] the Michigan Supreme Court recognized a pertinent rule of statutory construction providing that inclusion by specific mention excludes that which is not mentioned. Thus, it is manifest that MCL 42.9 allows a township board to abolish a position within township government as long as the position is not the clerk or the treasurer. Armstrong's position fits outside this very limited class of protected positions.

Nevertheless, Armstrong claims that the township supervisor, Prater, must first recommend abolishing a position before a position can be abolished. It is undisputed that Prater did not recommend the abolition of Armstrong's position and, indeed, cast the sole vote against that action. However, we conclude that MCL 42.9 does not require a township supervisor's recommendation to abolish a position. As noted above, MCL 42.5 provides that "the supervisor shall be the presiding and executive officer of the board and shall have an *equal* voice and vote in the proceedings of the board."[26] If MCL 42.9 were read to require the township supervisor's recommendation for every position to be abolished, MCL 42.5 would be meaningless in the context of employment decisions. Although MCL 42.9 requires the recommendation of a

---

[25] *People v Jahner*, 433 Mich 490, 500, n 3; 446 NW2d 151 (1989).

[26] Emphasis supplied.

township supervisor to create a position, ultimately it is the vote of the township board that determines whether the position is actually created. It is reasonable to conclude that a township board may abolish a position, created by its own action, without a recommendation by the township supervisor.

### (3) APPROPRIATIONS

MCL 42.29 states:

> At the beginning of each quarterly period during the fiscal year, and more often if required by the township board, the supervisor . . . shall submit to the township board data showing the relation between the estimated and actual income and expenses to date; and if it shall appear that the income is less than anticipated, the township board may reduce appropriations, except amounts required for debt and interest charges, to such a degree as may be necessary to keep expenditures within the cash income.

Armstrong argues that MCL 42.29 permits appropriation reductions only when the township supervisor has submitted information to the township board that demonstrates that the township's income is insufficient to meet budgetary expenses. He asserts that this did not occur here. Armstrong also argues that MCL 42.29 restricts a township board's ability to reduce appropriations to instances in which there is a budget deficit, which is also not the case here. We disagree.

There is no mandatory language contained within MCL 42.29 that refers to appropriation reductions themselves. In other words, a township board *may* reduce appropriations, but it does not necessarily have to do so. MCL 42.29 simply does not provide that a township board can reduce appropriations *only*

when there has been a reduction in income. In addition, MCL 42.27 and 42.28 clearly indicate that a township board has full and absolute control over the township budget. Thus, even without proof of a fiscal emergency, the township board had authority to eliminate Armstrong's position.

### F. GOVERNMENTAL IMMUNITY

MCL 691.1407(5) provides:

> A judge, a legislator, and the elective or highest appointive executive official of all levels of government are immune from tort liability for injuries to persons or damages to property if he or she is acting within the scope of his or her judicial, legislative, or executive authority.

Here, the parties' arguments center on whether defendant board members were acting within the scope of their legislative authority. In *Marrocco v Randlett*,[27] the Michigan Supreme Court stated:

> The determination whether particular acts are within their authority depends on a number of factors, including the nature of the specific acts alleged, the position held by the official alleged to have performed the acts, the charter, ordinances, or other local law defining the official's authority, and the structure and allocation of powers in the particular level of government.

In *American Transmissions, Inc v Attorney General*,[28] the Court, reviewing *Marrocco* and *Smith v*

---

[27] *Marrocco v Randlett*, 431 Mich 700, 711; 433 NW2d 68 (1988).

[28] *American Transmissions, Inc v Attorney General*, 454 Mich 135, 141; 560 NW2d 50 (1997).

*Dep't of Public Health,*[29] explained:

> Earlier in *Marrocco, supra* at 707-708, this Court took from a 1987 plurality opinion [*Smith*] the emphasized portion of this statement:
>
> "We conclude this inquiry by finding that intentional torts are immune if committed within the scope of a governmental function; however, *the intentional use or misuse of a badge of governmental authority for a purpose unauthorized by law is not the exercise of a governmental function.*"

## The *American Transmissions* Court also clarified:

> This Court's *Marrocco* opinion does not explicitly adopt an intent exception to governmental immunity, noting that a variety of factors must be considered to determine whether an official is acting with the scope of "executive authority." 431 Mich 711. This Court did not include "motive" in that roster of considerations, and declined "to rule with specificity concerning the authority of officials" in that case. 431 Mich 711. Further, the language taken from the *Smith* plurality, 428 Mich 611, in *Marrocco* at 707-708, adds no such test.
>
> In this case, the Attorney General allegedly defamed the plaintiffs during a 1991 television interview that concerned an earlier fraud investigation conducted by his department. Doubts had been expressed regarding the propriety of the department's conduct, and Mr. Kelley was responding to questions regarding the investigation. On these facts, the Attorney General clearly is "immune from tort liability" because he was "acting within the scope of [his] executive authority." MCL 691.1407(5); MSA 3.996(107)(5).[30]

---

[29] *Smith v Dep't of Public Health,* 428 Mich 540; 410 NW2d 749 (1987), aff'd on other grounds sub nom *Will v Michigan Dep't of State Police,* 491 US 58; 109 S Ct 2304; 105 L Ed 2d 45 (1989).

[30] *American Transmissions, supra* at 143-144.

*American Transmissions* thus makes plain that the trial court correctly dismissed all of Armstrong's tort claims because the township board members were protected from liability by governmental immunity. The fact that Armstrong alleged that defendants committed intentional torts, and that they had an improper motive and purpose in eliminating his position along with an unlawful intent, is meaningless in light of the language in *American Transmissions* because, as we have held, defendants were acting within the scope of their statutory authority in eliminating that position.

We note that MCL 691.1407(5) provides immunity only from tort liability. Armstrong's complaint contained two counts, counts V and VI, that alleged contract claims, for which governmental immunity has no relevance. Nevertheless, Armstrong has failed to present a single word of argument on appeal to the effect that the trial court erred in applying the doctrine of governmental immunity to contract claims. It is not our function to manufacture arguments on Armstrong's behalf and we decline to do so.[31] We conclude that Armstrong has abandoned any separate argument that he might have in connection with his contract claims.

Because Armstrong raised federal, as well as state, causes of action, we are required to examine federal case law on the issue of governmental immunity. In *Bogan v Scott-Harris*,[32] a case almost factually identical to the present case, the petitioners argued that they, as local officials performing legislative func-

---

[31] See *Mitcham v Detroit*, 355 Mich 182, 203; 94 NW2d 388 (1959).

[32] *Bogan v Scott-Harris*, 523 US 44, 46; 118 S Ct 966; 140 L Ed 2d 79 (1998).

tions, were entitled to immunity for their acts of introducing, voting for, and signing an ordinance eliminating the government office held by the respondent. The respondent was an administrator in city government. The petitioners, the city's mayor, the city council's vice president, and several other city officials, voted to eliminate the respondent's position allegedly because of budgeting problems.[33] The respondent-administrator then filed suit under 42 USC 1983, alleging that the elimination of her position was motivated by unlawful racial animus and a desire to retaliate against her for exercising her First Amendment rights.[34] The United States Supreme Court rejected the administrator's argument, holding:

> Because the common law accorded local legislators the same absolute immunity it accorded legislators at other levels of government, and because the rationales for such immunity are fully applicable to local legislators, we now hold that local legislators are likewise absolutely immune from suit under § 1983 for their legislative activities.

*     *     *

> Whether an act is legislative turns on the nature of the act, rather than on the motive or intent of the official performing it. . . .
>
> This leaves us with the question whether, stripped of all considerations of intent and motive, petitioners' actions were legislative. We have little trouble concluding that they were. Most evidently, petitioner [city council vice president] Roderick's acts of voting for an ordinance were, in form, quintessentially legislative. Petitioner [Mayor] Bogan's introduction of a budget and signing into law an ordinance also

---

[33] *Id.* at 46-47.

[34] *Id.* at 47.

were formally legislative, even though he was an executive official.[35]

*Bogan* clearly requires dismissal of Armstrong's federal claims. The board members' action in eliminating the funding for Armstrong's position was a legislative activity that could be undertaken pursuant to the Charter Township Act.

### III. DISQUALIFICATION OF THE TRIAL COURT

#### A. STANDARD OF REVIEW

When this Court reviews a motion to disqualify a judge, the trial court's findings of fact are reviewed for an abuse of discretion; however, the applicability of the facts to relevant law is reviewed de novo.[36]

#### B. BIAS AND INTEREST

MCR 2.003(B) provides the grounds for disqualifying a judge:

A judge is disqualified when the judge cannot impartially hear a case, including but not limited to instances in which:

(1) The judge is personally biased or prejudiced for or against a party or attorney.

*            *            *

(5) The judge knows that he . . . has an economic interest in the subject matter in controversy or in a party to the proceeding or has any other more than de minimis interest that could be substantially affected by the proceeding.

---

[35] *Id.* at 49, 54-55.

[36] *FMB-First Michigan Bank v Bailey*, 232 Mich App 711, 728; 591 NW2d 676 (1998). But see MCR 2.613(C) (factual findings generally reviewed for clear error).

Armstrong refers to MCR 2.003(B)(1) and (5) in his argument, but also argues that disqualification can be based on the appearance of impropriety.

In *Cain v Dep't of Corrections*,[37] the Michigan Supreme Court stated that "[i]n order for disqualification pursuant to MCR 2.003(B)(1) to be proper, the judge must have shown actual bias against a *party* or a party's attorney." Apart from MCR 2.003(B)(1), "[a]s a general rule, a trial judge is not disqualified absent a showing of actual bias or prejudice."[38] Here, Armstrong simply argues that he was prejudiced by the trial court, as evidenced by its ruling on the motions for summary disposition. In essence, Armstrong argues that the trial court demonstrated actual bias by ruling in favor of defendants. In *Cain*,[39] the Court indicated that judicial rulings, in and of themselves, almost never constitute a valid basis for a motion alleging bias, unless the judicial opinion displays a " 'deep-seated favoritism or antagonism that would make fair judgment impossible' " and overcomes a heavy presumption of judicial impartiality. In *Band v Livonia Associates*,[40] this Court stated:

> Repeated rulings against a litigant, even if erroneous, are not grounds for disqualification. The court must form an opinion as to the merits of the matters before it. This opinion, whether pro or con, cannot constitute bias or

---

[37] *Cain v Dep't of Corrections*, 451 Mich 470, 503; 512 NW2d 210 (1996).

[38] *People v Houston*, 179 Mich App 753, 756; 446 NW2d 543 (1989).

[39] *Cain, supra* at 496, quoting *Liteky v United States*, 510 US 540, 555; 114 S Ct 1147; 127 L Ed 2d 474 (1994).

[40] *Band v Livonia Associates*, 176 Mich App 95, 118; 439 NW2d 285 (1989). See *Czuprynski v Bay Circuit Judge*, 166 Mich App 118, 124; 420 NW2d 141 (1988), and *Cain, supra* at 496-497, citing *Liteky, supra* at 550, 555-556.

prejudice. *Mahlen Land Corp v Kurtz*, 355 Mich 340, 350; 94 NW2d 888 (1959).

Further, in *Ireland v Smith*,[41] this Court stated that "[a] trial judge's erroneous ruling, even when 'vigorously and consistently expressed,' is not grounds for disqualification." Thus, Armstrong's claim of actual bias based solely on the trial court's ruling on the motions for summary disposition cannot be sustained. It cannot be said that the trial court's ruling on the motions for summary disposition evidenced deep-seated favoritism or antagonism toward Armstrong.

C. "THE APPEARANCE OF IMPROPRIETY"

In *In re Disqualification of 50th Dist Court Judge (On Remand)*,[42] the prosecutor argued that the trial judge should have been disqualified because he had financial and economic ties with the law firm of one of the attorneys appearing before him. This Court agreed, explaining:

Proceeding to consideration of the merits, we hold that the appearance of impropriety arising from the financial ties between Judge Brown and Mr. Hatchett's law firm required Judge Brown to disqualify himself *even without a showing of actual bias or prejudice*. We reach this conclusion after evaluating the totality of the circumstances. The ownership of the property on which the main office and the annex office of attorney Hatchett's law firm are located, the payment of the property taxes by the firm over the years, and the payment and discharge of a mortgage for which Judge Brown was jointly liable certainly gives the appear-

---

[41] *Ireland v Smith*, 214 Mich App 235, 249; 542 NW2d 344 (1995).

[42] *In re Disqualification of 50th Dist Court Judge (On Remand)*, 193 Mich App 209, 213; 483 NW2d 676 (1992).

ance of impropriety and reflects adversely on the judge's impartiality and ability to fairly administer justice.[43]

In *Cain*, the Michigan Supreme Court, in the context of reviewing a motion for disqualification, also noted that "[w]e acknowledge there may be situations in which the appearance of impropriety on the part of a judge . . . is so strong as to rise to the level of a due process violation."[44] Further:

> A showing of actual bias is not necessary where "experience teaches that the probability of actual bias . . . is too high to be constitutionally tolerable." *Crampton v Dep't of State*, 395 Mich 347, 351; 235 NW2d 352 (1975). Certain situations have been identified as posing such a risk:
>
> "[W]here the judge or decisionmaker
>
> (1) has a pecuniary interest in the outcome;
>
> (2) 'has been the target of personal abuse or criticism from the party before him';
>
> (3) is 'enmeshed in [other] matters involving petitioner . . .'; or
>
> (4) might have prejudged the case because of prior participation as an accuser, investigator, fact finder or initial decisionmaker." [*Crampton*, 395 Mich at 351.][45]

Here, the appearance of impropriety, if it exists at all, is insufficient to reverse the findings of the trial court and the chief judge. The record is clear that, at the time the trial court ruled on the summary disposition motions, it had no economic, pecuniary, or other financial ties to the board members unlike the court in *50th Dist Court Judge*. In addition, the four excep-

---

[43] *Id.* at 214.

[44] *Cain, supra* at 512, n 48.

[45] *Houston, supra* at 756-757.

tions to the actual bias requirement do not apply to these facts.

Additionally, in *Anson v Barry Co Drain Comm'r*,[46] this Court noted that situations that arose in a judge's past, and that give rise to a request to disqualify, cannot overcome the presumption of impartiality if their connection to the case at hand is too tenuous. Any fundraising assistance involved in the trial judge's candidacy for the Michigan Supreme Court three years earlier was so tenuous that it could not overcome the presumption of impartiality. There was no ongoing matter or relationship between the trial judge and the board members and no ongoing basis or reason for the trial judge to favor those board members. In sum, we conclude that there were no grounds to disqualify the judge handling this case.

Because we have affirmed on the above grounds, we need not reach the board members' argument that the trial court erred in failing to dismiss Armstrong's first amended complaint with regard to the allegations against them.

Affirmed.

---

[46] *Anson v Barry Co Drain Comm'r*, 210 Mich App 322, 327; 533 NW2d 19 (1995).