# STATE OF MICHIGAN

# COURT OF APPEALS

KENDRA ANNE MALLISON,

Plaintiff-Appellee,

v

CARL FREDERICK MALLISON,

Defendant-Appellant.

UNPUBLISHED
May 26, 2015

No. 321227
Manistee Circuit Court
LC No. 12-014731-DM

Before: GLEICHER, P.J., and K. F. KELLY and SERVITTO, JJ.

PER CURIAM.

Defendant appeals as of right a March 25, 2014 judgment of divorce. Finding no errors warranting reversal, we affirm.

## I. BASIC FACTS AND PROCEDURAL HISTORY

Plaintiff filed for divorce on October 3, 2012. The parties had been married since June 27, 1997 and had two minor children. Ex parte orders required defendant to pay temporary spousal support in the amount $2,000 a month and child support in the amount of $1,559 a month. The orders were not entered until March 2013, but were effective from the date the divorce action was filed.

Defendant filed a motion to set aside the orders on January 7, 2013, alleging that the orders were based on an inaccurate assumption of defendant's salary. He also argued that the orders failed to consider that defendant gave plaintiff in excess of $17,000 prior to the ex parte motions being filed. Defendant, who worked as a truck driver in North Dakota, explained that he was currently in the "slow season" of his employment and earning considerably less than his previous $100,000 a year salary. Attached to the motion was defendant's "affidavit" – a nine-page single-spaced rant on "how it was to be married to Kendra Mallison." In it, defendant accuses plaintiff of having numerous extramarital affairs, as well as problems with drinking and gambling. It is noteworthy that, in spite of plaintiff's alleged outrageous conduct, defendant never once contested child custody.

Defendant failed to appear at a January 28, 2013 hearing. Defense counsel argued that defendant had not been working for the past three months and that the Friend of the Court (FOC) should review the issue of child support. Counsel also acknowledged, however, that his client had not submitted the proper paperwork to communicate his actual income. Plaintiff's attorney

-1-

noted that as of October 2012, defendant had earned $92,000. And, although defendant claimed he gave defendant between $15,000 and $17,000 in the months leading up to the divorce, he failed to mention that the money was deposited in a joint account. Because of a domestic violence conviction, the parties had not had contact. The trial court noted: "I'm not going to change the order at this time, but if you want an evidentiary hearing on it, and he wants to come in and testify -- I'll hear from him, but other than that the order is going to remain in place." Plaintiff's counsel then brought up a renewed motion to show cause why defendant should not be held in contempt for failing to comply with the previous orders. Defense counsel admitted that he had "no good response to it, Your Honor. If the order is outstanding I understand he should be paying. He doesn't have the funds to do so, and that's why we filed a motion to grant an evidentiary hearing." The trial court responded, "I'll set it and if he isn't here there will be a warrant that issues for his arrest."

However, after the hearing, the parties entered into an agreement whereby defendant agreed to pay plaintiff's attorney $5,000 for attorney fees and pay plaintiff $4,000 for temporary spousal support. Defendant also agreed to pay $2,000 a month in spousal support during the pendency of the action.

Defendant failed to appear at a June 3, 2013 settlement conference and the trial court issued an order that defendant show cause why he should not be held in contempt of court. At the July 8, 2013 hearing defendant told the court that he had recently changed jobs. He was previously making over $100,000, but claimed that the hours were "illegal." He now made approximately $42,000 a year. As of the date of the hearing, defendant owed $13,161.74 in child support and $9,916 in spousal support. The trial court withdrew the arrest warrant and ordered defendant to pay on the support and arrearages. Defendant was also fined for his failure to appear at the settlement conference. The court told defendant "you don't have to be here every day for everything that's going on but you have to obey the Court's orders. And I ordered you to be here on these things. You better be here. And I've been easy on you today."

A bench trial was held on January 15, 2014. Defendant was represented by a new attorney. The following exchange took place:

MR. PACIORKA: Your Honor, Steven Paciorka on behalf of the defendant, Carl Mallison. Carl Mallison is requesting permission to appear telephonically at today's trial.

THE COURT: What did I tell you yesterday?

MR. PACIORKA: Your Honor –

THE COURT: Or the day before yesterday.

MR. PACIORKA: I'm not sure if I mentioned this on Monday, but Carl Mallison's mother purchased a plane ticket for him to be here. His plane was to depart on the 12th and he did not get on that plane.

THE COURT: I know, he never does. He doesn't want to come here.

-2-

MR. PACIORKA: Mr. Mallison –

THE COURT: He's running and hiding from the Court. He doesn't want to be here. I understand that.

MR. PACIORKA: I'm simply relaying Mr. Mallison's communication to me that he did not get on that plane because he was violently ill. And because of that, he indicated to me that he could not be here today.

THE COURT: Yeah, he can never be here.

MR. PACIORKA: So for that reason Mr. Mallison requests permission to appear telephonically.

THE COURT: No.

Plaintiff testified that she and defendant had been married for 17 years. She was 37 years old and he was 39. Plaintiff lived with her 16-year-old daughter and 11-year-old son. In December 2011, defendant decided to take a job in North Dakota. He sent plaintiff approximately $3,000 a month to live on. However, in September 2012, defendant "showed up" in the driveway with his girlfriend and said he wanted a divorce. Plaintiff testified that she was forced to file for divorce in October 2012 because defendant stopped sending money home and refused to provide any support.

Plaintiff believed that defendant earned approximately $100,000 a year. At no time did he tell plaintiff that he could not afford to send home $3,000 a month. Defendant voluntarily left the job at ULM Field Services. He went back in March 2013 but then quit a second time. Plaintiff did not know whether defendant had been ordered to work 20-hour days; she believed he worked approximately 12 hours a day. To her knowledge, defendant now worked for MBI Energy Services. She had no idea how much he earned.

Plaintiff testified that she never worked full time during the parties' marriage and there was a five or six year period of time when she did not work at all. They had agreed that plaintiff should stay home with the children. Plaintiff was now a part-time teller at State Savings Bank and grossed approximately $8,000 a year. She was behind on her bills because of defendant's failure to provide support, although they owned the marital home – a single-wide trailer on five acres valued at approximately $40,000 – free and clear. Property taxes were in arrearages. Plaintiff acknowledged that the marital home was from defendant's family, but denied that it was part of defendant's inheritance. Some of the land that they received was foreclosed upon and plaintiff was not sure whether they were going to be responsible for any deficiency judgment. It was defendant's idea to mortgage the property.

Plaintiff testified that defendant failed to appear at mediation in April 2013. Around that time, the parties agreed that defendant would pay plaintiff's attorney $5,000 and make a lump sum payment to plaintiff of $9,000, but he failed to do so. Defendant also failed to appear at a June 2013 settlement conference. Even though defendant claimed he could not attend those proceedings, he went to the marital home in July 2013 and took personal property. Plaintiff alleged that defendant took a 2002 GM Sierra pickup truck (valued at $7,000), a 2006 700

Polaris snowmobile (valued at $3,000), a 1985 or 1987 Oldsmobile coupe (valued at $5,000), a car hauler (valued at $800), and a snow plow (valued at $1,500).[1]  In so doing, defendant took the parties' best running vehicle, leaving plaintiff with no operating vehicle.  She was left with a GMC Envoy valued at $1,500, and a 1993 Ford Ranger valued at $800.  There was a 1993 GMC 1500 at either defendant's mother's or his sister's house valued at $1,500.  It needed a transmission.  As of the time of the trial, plaintiff did not have a vehicle that worked.  She relied on a coworker for transportation to work and on family and friends for transporting her to the grocery store.

Plaintiff believed that defendant would like to keep certain farm equipment – a combine, two tractors, and two discs – and she had no use for them.  She valued them at between $8,000 to $10,000.  The children had two Ski-Doo snowmobiles that plaintiff did not believe should go into the equation for value on her side.  She asked to be awarded the marital home.  She also asked that the $2,000 monthly spousal support order stay in effect for three years in order to provide her with an opportunity to obtain a full-time job or go back to school.  Defendant did not contest child custody; he had not seen the children since July 2013.  Plaintiff testified that defendant texted the parties' son that he could not come back to Michigan because plaintiff "takes all the money."

FOC worker Patricia Heins testified that in calculating child support, the FOC had "some problems getting" defendant's actual income.  Heins utilized the employer disclosure income information and determined that defendant's gross income for ULM Corporation in 2012 was $91,538.21.  Plaintiff's income was determined to be $717.75 monthly.  Based on those figures, monthly child support was set at $1,559, with a premium adjustment resulting in $1,505.  Defendant contacted the FOC on one occasion to say he had lost his job.  He was told that he would need to file a motion, but he "never followed through" and never submitted any different documentation.  Defendant's arrearages were as follows:  $18,991.34 in child support, $681.51 in medical support, $17,633.78 in spousal support.  With fees, the total arrearage was $37,410.13.

The trial court awarded plaintiff full physical and legal custody of the children.[2]  Child support remained at $1,505 based on defendant's income.  The trial court explained that it saw "nothing unfair or inequitable about leaving it there when he chooses not to carry through with a motion for change, a motion to reduce his child support, and chooses not to submit the information."

The trial court awarded plaintiff temporary spousal support of $1,800 a month for six months, then $1,600 for six months, then $1,200 for one year, then $1,000 for the final year.

---

[1] Plaintiff's friend, Charlene Derosia, saw the items at a convenience store and took a picture for plaintiff because it appeared that defendant was "heading out of town."

[2] The trial court did not go through the statutory best interests factors because defendant did not dispute custody.  Defendant was awarded reasonable parenting time.

Regarding property division, the trial court awarded plaintiff the marital home "free and clear of any claim of defendant." Plaintiff was also awarded all of the household furniture and "matters that she's testified to that she wants." Defendant was allowed to take anything plaintiff did not want and was also allowed to keep the vehicles "he carted off," but he could not have the snowmobiles. Defendant could have his tools and farm equipment.

The trial court also awarded plaintiff an additional $5,000 in attorney fees, bringing the total to $10,000.

The trial court entered a judgment of divorce on March 25, 2014. Defendant now appeals as of right.

Defendant's pro se appellate brief is grossly inadequate. In many instances, he fails to cite to relevant portions of the lower court record or to legal authority. "It is not enough for an appellant in his brief simply to announce a position or assert an error and then leave it up to this Court to discover and rationalize the basis for his claims, or unravel and elaborate for him his arguments, and then search for authority either to sustain or reject his position." *Mitcham v Detroit*, 355 Mich 182, 203; 94 NW2d 388 (1959). Moreover, defendant attempts to argue many facts that are not of record. "This Court's review is limited to the record established by the trial court, and a party may not expand the record on appeal." *Sherman v Sea Ray Boats, Inc*, 251 Mich App 41, 56; 649 NW2d 783 (2002). We nevertheless address the merits of his claims of error.

## II. DISTRIBUTION OF THE MARITAL ESTATE

Defendant first argues that the trial court erred in distributing the marital estate. We disagree.

> In a divorce action, this Court reviews for clear error a trial court's factual findings on the division of marital property and whether a particular asset qualifies as marital or separate property. Findings of fact are clearly erroneous when this Court is left with the definite and firm conviction that a mistake has been made. Special deference is afforded to a trial court's factual findings that are based on witness credibility. This Court further reviews whether a trial court's dispositional rulings are fair and equitable in light of the trial court's findings of fact, but this Court will reverse only if definitely and firmly convinced that the disposition is inequitable. [*Hodge v Parks*, 303 Mich App 552, 554-555; 844 NW2d 189 (2014) (internal quotation marks and citations omitted).]

Our Court has set forth the considerations that a trial court must consider when distributing the marital estate:

> The goal in distributing marital assets in a divorce proceeding is to reach an equitable distribution of property in light of all the circumstances. The trial court need not divide the marital estate into mathematically equal portions, but any significant departure from congruence must be clearly explained. Trial courts may consider the following factors in dividing the marital estate: (1) the duration of the marriage, (2) the contributions of the parties to the marital estate, (3) the

age of the parties, (4) the health of the parties, (5) the life situation of the parties, (6) the necessities and circumstances of the parties, (7) the parties' earning abilities, (8) the parties' past relations and conduct, and (9) general principles of equity. When dividing marital property, a trial court may also consider additional factors that are relevant to a particular case. The trial court must consider all relevant factors but not assign disproportionate weight to any one circumstance. [*Berger v Berger*, 277 Mich App 700, 716-17; 747 NW2d 336 (2008) (internal quotation marks and citations omitted).]

Generally, the parties' separate assets may not be invaded, so the trial court's first step is to determine "what property is marital and what property is separate." *Cunningham v Cunningham*, 289 Mich App 195, 201; 795 NW2d 826 (2010). As a general rule, "marital property is that which is acquired or earned during the marriage." *Id.*

Defendant complains that the trial court improperly relied upon plaintiff's testimony to determine what assets were a part of the estate but defendant did not provide any testimony or evidence that contradicted plaintiff's testimony. He blames the trial court for limiting his participation, but defendant's conduct revealed that he had no intention of participating in person for varying reasons. During the parties' closing arguments, the following exchange took place:

MR. PACIORKA [defense counsel]: Your Honor, Mr. Mallison was not here today. So I can tell the Court what he would've testified to, but we didn't have the benefit of that testimony. I can tell the Court that the testimony we received was – I mean, it was one-sided and it's a result –

THE COURT: Well, whose fault is that?

MR. PACIORKA: Regardless, that's what happened here. And unless Mr. Mallison is allowed to somehow participate in his divorce, it's going to result in a one-sided spousal support and child support order, one-sided judgment of divorce.

THE COURT: He has been allowed to participate. He has chosen not to.

MR. PACIORKA: He was not allowed to participate telephonically today.

THE COURT: That's correct. He doesn't want to come to Michigan.

MR. PACIORKA: He's working.

THE COURT: He's in – he's been in contempt of this Court for his failure to show up at these things, the mediation, the settlement conference. What is so special about him from any other litigant who is expected to obey court orders?

MR. PACIORKA: How harsh of a sanction is required when somebody has committed the actions that Mr. Mallison has committed?

-6-

THE COURT: He hasn't seen anything of a harsh sanction.

MR. PACIORKA: Mr. Mallison is working full time and yet Ms. Mallison seeks to have him imputed at a job where, again, it's simply not realistic.

THE COURT: We don't know that. What's the evidence of that?

MR. PACIORKA: We don't have that evidence, Your Honor.

THE COURT: Yeah.

MR. PACIORKA: But the reality is that this is not going to result in an equitable judgment or order.

THE COURT: The reality is that he refuses to come to court to participate in proceedings as ordered, mediation, settlement conference, that's the reality. If there's inequity, it's of his own doing.

Defense counsel further argued that the property award was "massively disproportionate" and that plaintiff would receive "the crown jewel of the family," which was the marital home. The trial court disagreed that a single-wide trailer on five acres with a wood burning stove worth a state equalized value of $20,000 was a "crown jewel." The trial court acknowledged that the property distribution would not be equal because defendant had "already carted off unilaterally anything of value."

In dividing the parties' property, the trial court stated:

The Court will award her, that is plaintiff, the marital home and the five acres free and clear of any claim of defendant. She has considerably less income earning ability than he does. She has to provide a home for the kids, whom he has virtually deserted. And as far as the Court is concerned, it's a place where she's residing in poverty. And with the child support and spousal support, the temporary spousal support, if he pays it, will keep them I think above the poverty level, but it certainly won't put them in any kind of luxurious situation.

She can have all of the household furniture and matters that she's testified to that she wants. And she can make – counsel can arrange the matters that she says – the items that she says she doesn't want, if he wants to pick them up through some arrangement . . .

Plaintiff was also awarded all of the household furniture and "matters that she's testified to that she wants." Defendant was allowed to take anything plaintiff did not want and was also allowed to keep the vehicles "he carted off," but he could not have the snowmobiles. Defendant could have his tools and farm equipment. The trial court declined defense counsel's request that any debt arising out of the foreclosure of the agricultural property be equally divided. The trial court explained: "No, I'm not going to do it. She has no ability to add or take on any more debt whatsoever and the testimony is that this mortgage was a mortgage made at his instigation."

There is no reason to disturb the trial court's findings or property distribution. This Court is not left with the definite and firm conviction that a mistake has been made, especially in light of defendant's failure to offer legally relevant evidence to contradict plaintiff's testimony.

## III. JUDICIAL BIAS

Defendant next argues that the trial court judge was biased against him. We disagree. "Where a defendant knows of alleged bias of the trial judge prior to trial and fails to move for disqualification, the issue is not preserved for appeal." *Kroll v Crest Plastics, Inc*, 142 Mich App 284, 291; 369 NW2d 487 (1985). Defendant complains that the trial court's alleged bias was demonstrated as early as July 8, 2013 hearing, but he failed to file a motion for disqualification under MCR 2.003. As such, this Court's review is limited to determining whether a plain error affecting defendant's substantial rights occurred. See *Lenawee Co v Wagley*, 301 Mich App 134, 164–165; 836 NW2d 193 (2013).

"Due process requires that an unbiased and impartial decision-maker hear and decide a case." *Mitchell v Mitchell*, 296 Mich App 513, 523; 823 NW2d 153 (2012). Under MCR 2.003(C)(1), a judge must be disqualified from hearing a case in which he cannot act impartially or is biased against a party. However "[a] trial judge is presumed unbiased, and the party asserting otherwise has the heavy burden of overcoming the presumption." *Mitchell*, 296 Mich App at 523. "[J]udicial rulings, in and of themselves, almost never constitute a valid basis for a motion alleging bias, unless the judicial opinion displays a "deep-seated favoritism or antagonism that would make fair judgment impossible" and overcomes a heavy presumption of judicial impartiality. *Armstrong v Ypsilanti Charter Twp*, 248 Mich App 573, 597; 640 NW2d 321 (2001), quoting *Cain v Dep't of Corrections*, 451 Mich 470, 503; 548 NW2d 210 (1996). In fact, "a trial judge's remarks made during trial, which are critical of or hostile to counsel, the parties, or their cases, ordinarily do not establish disqualifying bias." *In re MKK*, 286 Mich App 546, 567; 781 NW2d 132 (2009).

A review of the transcripts reveals that the trial court was displeased with defendant's behavior, but falls far short of demonstrating personal animus or bias. At the July 8, 2013 hearing, the court was perturbed because defendant had not appeared at the June 3, 2013 settlement conference and then failed to appear on the show cause, causing a warrant to issue for defendant's arrest. The following exchange took place regarding defendant's decision to quit the job that had paid $100,000 a year:

> THE COURT: Yeah, and you quit. You didn't want to work that hard.
>
> THE DEFENDANT: I'm sorry, Your Honor, it's illegal to work that hard.
>
> THE COURT: Well, that's your conclusion but you didn't do anything about it.
>
> THE DEFENDANT: Well, I begged them not to run me that hard, Your Honor, I did.
>
> THE COURT: You told them you didn't want to work that hard.

MS. HORVATH [for defendant]: Your Honor, obviously, even if he told his boss that he didn't want to do that, he would have been fired in the end anyways.

THE COURT: Well, that's not obvious at all. And he would have a great lawsuit, wouldn't he, against his employer for violation – he would have a great whistle blower claim, wouldn't he, if he was fired for reporting him for a whistle blower violation.

MS. HORVATH: There is that possibility.

THE COURT: Yeah. He doesn't want to show up here when the Court orders him to. He doesn't want to work that hard.

On the day of the bench trial, the trial court noted that defendant's continued absence from the proceedings revealed that he was "running and hiding from the Court. He doesn't want to be here." The trial court also had a strongly-worded ruling following the evidence at trial:

The reality is that he refuses to come to court to participate in proceedings as ordered, mediation, settlement conference, that's the reality. If there's inequity, it's of his own doing.

I'll tell you what the real inequity is, the real inequity is he leaves – he leaves his wife and two kids in poverty. In poverty. I mean, frankly, it's disgusting. I mean, he chooses – if he chooses – if he wants a divorce, he doesn't want – he doesn't want to live with her, that's his decision, that happens. You know, we have Michigan no fault divorce. That's part of life. I see these every day and I'm not – I'm not appalled or upset by that at all. But where he supports her to the tune of $3,000 a month until he meets the new girlfriend and then the money is only extracted from him – it's like practicing dentistry, pulling teeth.

I mean, if the relationship between him and the plaintiff has come to an end and it's time to end the marriage, I don't have a problem with that. I do have a problem with the poverty that he's left his children and former spouse in. He's the one that said he didn't want her to work. And then when she goes back – well, yeah, part-time only. So my conclusion is he's thinking of himself only and not meeting his adult responsibilities.

None of these instances, either in isolation or taken together, demonstrate that the trial court was biased against defendant. Defendant failed to appear when ordered to do so and the trial court was within its right to take defendant to task. There is nothing in the record to suggest that the trial court was biased or partial.

IV. ATTORNEY FEES

Defendant next argues that the trial court erred in awarding plaintiff additional attorney fees. We disagree.

An appellate court reviews "for an abuse of discretion a trial court's decision to award attorney fees in divorce proceedings" while reviewing "for clear error the findings of fact on which the trial court bases its decision, and any issues of law are reviewed de novo." *Loutts v Loutts*, ___ Mich App ___; ___ NW2d ___ (Docket No. 318468, issued February 10, 2015), slip op, p 7.

"A court in a divorce action may award attorney fees to enable a party to carry on or defend the action." *Woodington v Shokoohi*, 288 Mich App 352, 369; 792 NW2d 63 (2010). The relevant court rule, MCR 3.206(C), provides:

(1) A party may, at any time, request that the court order the other party to pay all or part of the attorney fees and expenses related to the action or a specific proceeding, including a post-judgment proceeding.

(2) A party who requests attorney fees and expenses must allege facts sufficient to show that

(a) the party is unable to bear the expense of the action, and that the other party is able to pay, or

(b) the attorney fees and expenses were incurred because the other party refused to comply with a previous court order, despite having the ability to comply.

The following exchange took place after the trial court handed down its custody and distribution decision:

THE COURT:  You want attorney fees?

MR. BERGSTROM [for plaintiff]:  We had, as the Court is aware, a $5,000 award that's 15 months old now that we haven't received one penny on and I would like to submit a bill of costs for an additional award of attorney fees.

THE COURT:  Well, you can submit it if you want, but I got a pretty good idea how much – I will award additional attorney fees.  I'm not making any commitment as to the amount.

MR. BERGSTROM:  Okay.

THE COURT:  If you want to submit it, I'll take a look.

MR. BERGSTROM:  Okay.  If not, Your Honor, I'm willing to roll the dice and just go with what the Court wants to award at this time.  I've been representing her for 15, almost 16 months now, since late last September, September of 2012.  So almost a year and a half.

THE COURT:  Well, it's been made more difficult by his – you know, you went to mediation that he didn't appear at.  You come to settlement conference, he doesn't appear.  So I'll give you $5,000 more.

And, of course, you know, we had this trial, so.

MR. PACIORKA: To understand then that the total attorney fee to Mr. Bergstrom will be $9,000?

MR. BERGSTROM: $10,000.

THE COURT: 10,000. $10,000.

MR. BERGSTROM: Your Honor, we will then since the proofs –

THE COURT: The case was made more difficult by defendant's refusal to make himself available to participate in the proceedings.

On appeal, defendant focuses only on his alleged inability to pay plaintiff's fees. However, a party's inability to pay is relevant only as to MCR 3.206(C)(2)(a), not under MCR 3.206(C)(2)(b), which addresses a party's own misconduct. The records supports the trial court's conclusion that the proceedings were complicated by defendant's failure to cooperate.

## V. CHILD SUPPORT

Because defendant's brief is poorly written, we assume that defendant is complaining about imputed income as it pertains to child support. We find no error on this issue.

An appellate court reviews for "an abuse of discretion a trial court's decision whether to impute income to a party. An abuse of discretion occurs when the trial court's decision falls outside the range of reasonable and principled outcomes." *Loutts v Loutts*, 298 Mich App 21, 25-26; 826 NW2d 152 (2012) (internal citation omitted).

"[A] trial court must presumptively follow the Michigan Child Support Formula (MCSF)." *Berger v Berger*, 277 Mich App at 722-23, quoting *Stallworth v Stallworth*, 275 Mich App 282, 283; 738 NW2d 264 (2007). "The formula is based on the needs of the child and the actual resources of each parent, including the factor of parental income." *Shinkle v Shinkle*, 255 Mich App 221, 225; 663 NW2d 481 (2003). Under the MCSF, "income" includes *potential* income when a parent is voluntarily unemployed or underemployed. *Clarke v Clarke*, 297 Mich App 172, 181; 823 NW2d 318 (2012). Thus, "[a] trial court is not limited to considering only a parent's actual income when assessing that parent's ability to pay support. Rather, the trial court may consider the parent's voluntarily unexercised earning ability." *Reed v Reed*, 265 Mich App 131, 163; 693 NW2d 825 (2005).

Regardless of defendant's argument that continuing to work at the job that paid $100,000 a year would have resulted in ill health, the fact of the matter is that defendant provided absolutely no evidence of income to either the trial court or the FOC. At the January 28, 2013, hearing, defense counsel argued that the FOC should review the issue of spousal support, but acknowledged that his client had not submitted the proper paperwork to communicate his actual income. At the July 8, 2013, hearing defendant told the court that he had recently changed jobs

and was now making approximately $42,000 a year. The trial court observed that "you quit" because "you didn't want to work that hard." And, finally, during opening statements, defense counsel noted that defendant had been working at a new truck driving job where he earned approximately $75,000. The trial court interjected: "We don't know that." Counsel acknowledged that defendant had not provided his updated income information to the FOC. When asked whether there was a reason defendant could not provide that information, defense counsel responded, "I don't believe so, no." Plaintiff believed that defendant earned approximately $100,000 a year and never previously complained about sending home $3,000 a month. As of the date of trial, she had no idea how much he earned. The FOC worker testified that, in calculating child support, the FOC had "some problems getting" defendant's actual income. FOC utilized the employer disclosure income information and determined that defendant's gross income for ULM Corporation in 2012 was $91,538.21. Plaintiff's income was determined to be $717.75 monthly. Based on those figures, monthly child support was set at $1,559, with a premium adjustment resulting in $1,505. The trial court allowed child support to remain at $1,505 based on defendant's income. The trial court explained that it saw "nothing unfair or inequitable about leaving it there when he chooses not to carry through with a motion for change, a motion to reduce his child support, and chooses not to submit the information." The trial court's decision to impute income was within the range of reasonable and principled outcomes.

## VI. SPOUSAL SUPPORT

Finally, defendant argues that the trial court erred in awarding spousal support. We disagree.

> It is within the trial court's discretion to award spousal support, and we review a spousal support award for an abuse of discretion. We also review for an abuse of discretion a trial court's decision whether to impute income to a party. An abuse of discretion occurs when the trial court's decision falls outside the range of reasonable and principled outcomes. The object in awarding spousal support is to balance the incomes and needs of the parties so that neither will be impoverished; spousal support is to be based on what is just and reasonable under the circumstances of the case. We review for clear error the trial court's factual findings regarding spousal support. A finding is clearly erroneous if, after reviewing the entire record, we are left with the definite and firm conviction that a mistake was made. If the trial court's findings are not clearly erroneous, we must determine whether the dispositional ruling was fair and equitable under the circumstances of the case. We must affirm the trial court's dispositional ruling unless we are convinced that it was inequitable. [*Loutts*, 298 Mich App at 25-26 (internal quotation marks and citations omitted).]

Among the factors to be considered when considering an award of spousal support are:

"(1) the past relations and conduct of the parties, (2) the length of the marriage, (3) the abilities of the parties to work, (4) the source and amount of property awarded to the parties, (5) the parties' ages, (6) the abilities of the parties to pay alimony, (7) the present situation of the parties, (8) the needs of the parties, (9) the

parties' health, (10) the prior standard of living of the parties and whether either is responsible for the support of others, (11) contributions of the parties to the joint estate, (12) a party's fault in causing the divorce, (13) the effect of cohabitation on a party's financial status, and (14) general principles of equity. [*Myland v Myland*, 290 Mich App 691, 695; 804 NW2d 124 (2010), quoting *Olson v Olson*, 256 Mich App 619, 631; 671 NW2d 64 (2003).]

As mentioned above in the context of child support, "[t]he voluntary reduction of income may be considered in determining the proper amount of alimony. If a court finds that a party has voluntarily reduced the party's income, the court may impute additional income in order to arrive at an appropriate alimony award." *Moore v Moore*, 242 Mich App 652, 655; 619 NW2d 723 (2000) (internal citation omitted).

In awarding plaintiff spousal support, the trial court noted:

With respect to spousal support, plaintiff I think would have a case maybe for longer spousal support [than the requested three years]. The marriage is just under 17 years. She has less background and experience in the job market and in the workforce because of her honoring his request and direction to spend her time as a full-time homemaker when the children were younger. And when – and when she got back into the workforce, to do it on a part-time basis at his request. And she's asked for three years of spousal support.

The trial court awarded plaintiff temporary spousal support of $1,800 a month for six months, then $1,600 for six months, then $1,200 for one year, then $1,000 for the final year. In so doing, the trial court pointed out that defendant had considerable earning ability based on his experience as a trucker. The trial court took judicial notice of the fact that there was high demand for that type of work in North Dakota and Montana. The trial court's findings are not clearly erroneous and the trial court did not abuse its discretion in awarding plaintiff alimony.

Affirmed.

/s/ Elizabeth L. Gleicher
/s/ Kirsten Frank Kelly
/s/ Deborah A. Servitto