*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

TT,

                Petitioner-Appellee,

v

KL,

                Respondent-Appellant.

FOR PUBLICATION
October 29, 2020
9:00 a.m.

No. 351531
St. Clair Circuit Court
LC No. 19-000463-PH

Before: BOONSTRA, P.J., and MARKEY and HOOD, JJ.

MARKEY, J.

Respondent KL appeals by right a modified nondomestic personal protection order (PPO) issued by the trial court under MCL 600.2950a following an evidentiary hearing on KL's motion to terminate the PPO. The original PPO had been entered upon request by petitioner TT. The amended PPO prohibited respondent "from posting defamatory statements about [p]etitioner on social media and/or from publishing such statements elsewhere." Respondent also appeals the trial court's order denying his motion to disqualify the court, along with the chief judge's order affirming the denial, after respondent filed suit against the trial court in a federal action that challenged the constitutional validity of MCL 600.2950a. We affirm the rejection of respondent's effort to disqualify the trial court, but we reverse with respect to the modified PPO and remand for further amendment of the PPO.

## I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

OGL is the daughter of respondent father KL. At the time of the events giving rise to the PPO litigation, it appears that OGL was around four years old. Respondent was in a bitter custody dispute with OGL's mother, who was respondent's former girlfriend. Petitioner TT is OGL's maternal great aunt. Respondent believed that OGL was regularly taken to the maternal grandparents' farm for visits, that a man, LW, was permitted by the grandparents to live in a shack

-1-

on the property, and that LW is a twice-convicted sex offender.[1]  Respondent went on a personal Internet crusade against OGL's mother and her family regarding his view that they were placing OGL in harm's way by allowing her to be in the presence of or have contact with LW.  Respondent's actions included the use of social media to highlight the situation and, ostensibly, to protect and obtain justice for OGL.  Respondent also complained that local governmental agencies and the courts had been of little help to his cause and had actually thwarted his efforts to safeguard his daughter.

It was within this context that petitioner filed a petition for a nondomestic PPO against respondent on March 4, 2019.  In the petition, petitioner indicated that OGL's mother had a PPO against respondent, that, apparently, OGL's mother had inadvertently left petitioner's name on some paperwork submitted to another court to show that respondent had violated that particular PPO, and that respondent thereafter began focusing his online attacks on petitioner.  Petitioner alleged that respondent sent her multiple messages through Facebook Messenger and began attacking her on social media.  She claimed that respondent posted her picture on public Facebook pages with a caption stating that she was helping a violent sexual predator.  Petitioner further asserted that respondent accused her numerous times on social media of allowing a pedophile, LW, to have access to OGL.  Petitioner attached the Facebook messages and posts to her petition, including a post on a Facebook page for a group started by respondent called "Justice for [OGL]," which stated:

> Pictured below is [petitioner].  As you can read, it seems as if [OGL's] maternal family is actively trying to protect the twice convicted violent sexual predator while simultaneously allowing him ongoing access to [OGL].
>
> [Petitioner] has also been putting in great efforts to help the twice convicted violent sexual predator['s] attempt to have [respondent] thrown in jail again due to alleged "violations" of the frivolous PPO the twice convicted violent sexual predator has against [respondent].[2]

Petitioner contended that none of respondent's claims were true.  She further maintained that she had never even met or talked to LW.

In the myriad computer screen shots showing communications between the parties and respondent's public posts, which were later admitted into evidence, there were snippets of a transcript from a child custody hearing regarding OGL.  LW testified at the hearing, stating that he could not remember ever having any physical contact with OGL, that a couple of times he went to the grandparents' house to do some work and OGL happened to be present, that he politely

---

[1] A document was submitted indicating that LW had a 1985 conviction for assault with intent to commit second-degree criminal sexual conduct, MCL 750.520g, and a 2004 conviction for fourth-degree criminal sexual conduct, MCL 750.520e.

[2] Aside from the PPO at issue in this case, it appears that respondent has been the subject of several other PPOs and accused of violating those PPOs.

responded to her when she spoke to him, and that he was told by a woman from Children's Protective Services not to be around OGL unsupervised. At one point in his testimony, LW indicated that he "was informed by [T] about what was being talked about." "T" is petitioner's first name. LW also testified that his "nephew's wife [T] was on the Facebook and she seen . . . a conversation going on between this guy [respondent] and somebody else."[3] LW additionally noted that "T" was not in court because she had just undergone surgery. It is evident that LW was not referring to petitioner when mentioning the name "T" at the hearing. And petitioner sent a message to respondent directly informing him that she did not personally know LW, that she had never spoken to him, and that she was not the person LW was referring to at the hearing. The trial court was not presented with any child-custody transcript references to petitioner's full name. We also note that the transcript references to "T" do not say anything about "T" engaging in acts or conduct that gave LW access to OGL.

In the PPO petition, petitioner noted that many people had messaged her about respondent's posts and asked her what was going on. She stated that she worked as an interpreter in a school and that she was very concerned that the false social media posts would affect her employment.[4] Petitioner was worried that parents and future prospective clients would not want her to be their interpreter. She implored the trial court to order the removal of the posts and to bar respondent from continuing to lie about her on social media.

On March 5, 2019, the trial court entered an ex parte PPO, which prohibited respondent from stalking petitioner, as stalking is defined in MCL 750.411h and MCL 750.411i. The PPO forbid respondent from following petitioner, appearing at her workplace, approaching or confronting her, entering onto her property, sending her mail, contacting her by phone, placing an object on or delivering an object to petitioner's property, threatening to kill or injure petitioner, and purchasing or possessing a firearm. Significantly, the PPO also prohibited respondent from "posting a message through the use of any medium of communication, including the Internet or a computer or any electronic medium, pursuant to MCL 750.411s." More specifically, the ex parte PPO provided that respondent was not permitted to "post[] comments about petitioner on social media."

During March 2019, three orders to show cause for violating the PPO were entered, along with three accompanying bench warrants for respondent's arrest. Another alleged violation occurred in May 2019, resulting in a show cause order and a bench warrant. The alleged violations concerned respondent's continued computer usage and social media posts touching on prohibited subjects. At different times, respondent was arrested, jailed, arraigned on the warrants, and posted bond.

On March 13, 2019, respondent filed a motion to terminate the PPO, claiming that petitioner made false statements in the PPO application, that he was not posting anything that was inaccurate, and that his actions were protected by the First Amendment. On March 21, 2019, an

---

[3] LW spoke of a PPO that he obtained against respondent.

[4] The record indicated that petitioner was employed as a sign language interpreter.

evidentiary hearing was conducted on respondent's motion to terminate the PPO. The trial court examined petitioner, who was unrepresented at the time, and counsel retained by respondent began cross-examination of petitioner before the hearing was adjourned and scheduled to continue at a later date.[5] On June 20, 2019, an evidentiary hearing was conducted on all four of the alleged PPO violations and that hearing was also continued. There were several adjournments with respect to the continuation of the hearing on the motion to terminate the PPO, as respondent's attorney was allowed to withdraw. Respondent obtained new counsel, and respondent was sent to jail for 10 days for being held in contempt by a different judge conducting a child custody hearing regarding OGL.

On June 27, 2019, respondent, under 42 USC 1983, filed a federal lawsuit against the trial court, naming the judge in her official capacity as the defendant and challenging the nondomestic PPO statute as violative of the First Amendment. On August 16, 2019, respondent amended the federal complaint, adding a due process claim under the Fourteenth Amendment.[6] Before the hearing on the motion to terminate the PPO was continued, respondent filed a notice of withdrawal of his motion to terminate the PPO on September 13, 2019, reserving "the right to refile said motion . . . ." On September 16, 2019, the trial court's judicial secretary e-mailed respondent's attorney and informed him that the court "is not granting your request to withdraw your [m]otion." On September 17, 2019, respondent filed an objection to the court's rejection of the notice of withdrawal, along with a motion to seek disclosure of communications and/or to disqualify the trial court. On the basis of assumed communications from the trial court's counsel in the federal lawsuit to the court that pertained to the instant PPO litigation, respondent argued that the court was in violation of Michigan Code of Judicial Conduct, Canon 3(A)(4), for considering these so-called ex parte communications outside the presence of the parties in the case at bar.[7] Respondent

---

[5] We shall discuss the evidence presented at the hearing in the analysis section of this opinion to the extent necessary to resolve the appeal. The evidence did include materials that had been attached to petitioner's PPO application.

[6] In the amended federal complaint, respondent alleged:

> [Respondent] is not attacking or challenging the Social Media injunction [PPO] itself but instead seeks declaratory and/or injunction relief by targeting as unconstitutional the Michigan non-domestic PPO statute as it has been authoritatively construed and may be attacked as explained and authorized by *Skinner v Switzer*, 131 S. Ct. 1289 (2011).

> * * *

> [T]he procedural safeguards employed under the Michigan non-domestic PPO statute are insufficient to pass constitutional muster required by procedural due process under the Fourteenth Amendment to the United States Constitution.

[7] Canon 3(A)(4) provides that "[a] judge shall not initiate, permit, or consider ex parte communications, or consider other communications made to the judge outside the presence of the parties concerning a pending or impending proceeding, except as follows . . . ."

contended that Canon 3(A)(4) required the trial court to disclose to the parties the substance of those presumed ex parte communications between the court and the court's attorney. Respondent further maintained that the trial court was required to recuse itself because of the appearance of potential bias in light of the federal lawsuit brought against the court. Respondent explained that this conflict or bias was why respondent had sought to withdraw the motion to terminate the PPO, which would have eliminated the problem. But because the trial court did not allow withdrawal of the motion, respondent felt it necessary that the court disqualify or recuse itself.

On September 19, 2019, the hearing on the motion to terminate the PPO was continued. At the start of the hearing, the court and the parties discussed the issues concerning respondent's efforts to withdraw the motion to terminate the PPO and the motion to disqualify the trial court. The trial court denied the motion to disqualify itself, again rejected respondent's attempt to withdraw the motion to terminate the PPO, and resumed and concluded the hearing on respondent's motion to terminate the PPO. With respect to the attempt to withdraw the motion to terminate the PPO, the trial court observed that respondent's requested hearing on the motion was already in progress, that the court had the right to control its docket and decide to continue with the motion, that respondent deserved to have his important constitutional claims resolved, and that there was no legal authority that gave respondent the absolute right to withdraw the motion.[8]

The trial court next ruled that recusal or disqualification was unnecessary. The court first found that respondent's motion was untimely under MCR 2.003(D)(1)(a) because it was filed almost three months after the federal lawsuit was commenced absent explanation why the motion was not filed soon after the federal case was initiated. The trial court also determined that the federal action was effectively against the office of the circuit court and not the judge personally, regardless of her being named as defendant. With respect to ex parte communications and Canon 3(A)(4), the trial court opined that any communications that may have occurred between the court's counsel in the federal case and the court were expressly authorized by law and did not have to be disclosed in light of the exception in Canon 3(A)(4)(e) ("A judge may initiate or consider any ex parte communications when expressly authorized by law to do so."). Immediately after the ruling on disqualification, respondent's attorney asked the court, for purposes of a planned appeal, to confirm whether there were any communications between the court and the court's attorney in the federal lawsuit regarding respondent's PPO litigation with petitioner. The trial court declined to answer the question, stating that it had no obligation to disclose that information.

The parties offered no further testimony or evidence in regard to the motion to terminate the PPO, and the court simply entertained the parties' extensive arguments. The trial court took the motion to terminate the PPO under advisement.

Respondent moved for the chief judge to review the trial court's decision not to recuse or disqualify itself. On October 24, 2019, before the trial court issued its ruling on the motion to terminate the PPO, the chief judge issued a written opinion and order denying respondent's challenge. The chief judge indicated that the federal lawsuit was clearly not grounds for

---

[8] The trial court entered an order denying withdrawal of the motion to terminate the PPO. The court acknowledged that respondent filed a notice of withdrawal and not a request or motion to withdraw, but the court viewed the matter as one requiring judicial permission.

disqualification. The chief judge claimed that the premise of the federal action was that respondent disagreed with the trial court's rulings in the instant action, and such is not a proper ground to disqualify a judge. The chief judge further ruled that the trial court did not have to recuse itself merely because respondent sued the court. The chief judge explained that "[i]f that were the case, any party unhappy with the judge assigned to their case could remove the judge by suing them." With respect to the alleged ex parte communications from the trial court's federal counsel to the court in supposed violation of Canon 3(A)(4), the chief judge found that while respondent had indicated his belief that these communications must have occurred, "there [was] no evidence suggesting such communications actually took place." Finally, the chief judge noted that contrary to respondent's assertion, the trial court's refusal to comment on the alleged ex parte communications did not suggest or imply that respondent's beliefs were accurate.

On October 28, 2019, the trial court issued a written opinion and order with respect to the motion to terminate the PPO. The court first summarized the evidence presented at the evidentiary hearing. The trial court observed that the evidence showed that respondent contacted petitioner several times in January and February 2019, that petitioner on occasion replied to respondent's messages, that respondent did not stop contacting petitioner despite her requests for him to do so, that petitioner blocked some of respondent's messages, that respondent never threatened petitioner with physical violence, and that the parties never met face-to-face after the messages began. The court noted the reference in the child custody transcript to a person with the same first name as petitioner and who had purportedly allowed contact between OGL and LW. The court stated that respondent had information in his possession that it was not petitioner who was being referred to in the transcript, yet he "apparently chose to ignore it and chose instead to continue to publish similar untrue allegations about the [p]etitioner." The trial court found that respondent posted false information about petitioner on the "Justice for [OGL]" page, on an "attorney review" Facebook page, on a Port Huron Facebook page, and on a Facebook page created by respondent using a false last name. The court concluded that the evidence established that petitioner did not personally know LW and had never made any contact with him although she knew of him because his name had been mentioned in the child custody litigation. The court further stated:

> [Petitioner] described the effect [r]espondent's postings have had on her. Petitioner is a sign language interpreter who works for an agency that contracts with various school districts to provide services for their hearing impaired students. She works directly with children. Respondent's Facebook postings have caused her anxiety, humiliation, and a fear of losing her job. Her employer has counseled her about [r]espondent's postings. She has had discussions about the postings with her boss, with the principal of the school where she primarily works, and with the superintendent of that school system. Acquaintances have sent her private Facebook messages and text messages asking her why she is exposing her niece to a convicted sex offender. She is on constant alert, wondering what [r]espondent will be posting about her next.

The trial court proceeded to review the relevant legal authorities. The court next ruled that petitioner had not demonstrated that respondent's conduct amounted to stalking behavior

prohibited by MCL 750.411h and MCL 750.411i.[9]  With respect to MCL 750.411s, which prohibits posting certain messages on the Internet or a computer without the victim's consent, the court acknowledged that it could not bar constitutionally protected speech or activity.  See MCL 750.411s(6) ("This section does not prohibit constitutionally protected speech or activity.").  But the trial court also indicated that defamatory statements are not constitutionally protected.  The court found that respondent knowingly made false statements about petitioner on social media, which would have caused a reasonable person to feel terrorized, frightened, intimidated, threatened, or harassed, and which did in fact cause petitioner to experience those feelings.  The trial court also concluded that respondent made those false postings for the purpose of harassing petitioner and causing others to harass her.  The court therefore ruled that petitioner had demonstrated reasonable cause to believe that respondent committed acts prohibited by MCL 750.411s.  The trial court amended the original PPO, removing the provisions based on MCL 750.411h and MCL 750.411i, and prohibiting respondent "from posting defamatory statements about [p]etitioner on social media and/or from publishing such statements elsewhere."[10]

Respondent now appeals by right.  We note that the amended PPO provided that it remained in effect until March 4, 2020, which date has now passed.  We do not know whether the PPO was continued or expired without renewal.  Nevertheless, the appeal is not moot even if the modified PPO is no longer in effect.  In *TM v MZ*, 501 Mich 312, 319-320; 916 NW2d 473 (2018), our Supreme Court held:

> We conclude that identifying an improperly issued PPO as rescinded is a live controversy and thus not moot. A judgment here can have a "practical legal effect" . . . because if the Court concludes that the trial court should never have issued the PPO, respondent would be entitled to have LEIN [Law Enforcement Information Network] reflect that fact. Thus, an appeal challenging a PPO, with an eye toward determining whether a PPO should be updated in LEIN as rescinded, need not fall within an exception to the mootness doctrine to warrant appellate review; instead, such a dispute is simply not moot. Consequently, and contrary to the decision of the Court of Appeals, the mere fact that the instant PPO expired during the pendency of this appeal does not render this appeal moot.

## II.  ANALYSIS

---

[9] As indicated earlier and under the authority of MCL 750.411h and MCL 750.411i, the PPO forbid respondent from following petitioner, appearing at her workplace, approaching or confronting her, entering onto her property, sending her mail, contacting her by phone, placing an object on or delivering an object to petitioner's property, threatening to kill or injure petitioner, and purchasing or possessing a firearm.

[10] By order dated November 7, 2019, the trial court dismissed all four of the alleged PPO violations. The record on appeal does not provide any insight regarding why the court dismissed the charges.

## A.  THE ISSUE CONCERNING EX PARTE COMMUNICATIONS AND DISQUALIFICATION OF THE TRIAL COURT

### 1.  RESPONDENT'S ARGUMENTS

Respondent argues that the protection afforded by the attorney-client privilege made it impossible for the trial court to both comply with Canon 3(A)(4) "and be a federal defendant with non-waived attorney-client privilege." Respondent asserts that the trial court was required to recuse itself due to the inability to comply with Canon 3(A)(4). Respondent essentially contends that the trial court must have had communications with its attorney in the federal action about the instant PPO case, "namely in the form of discussions via attorney-client privilege to defend the federal lawsuit." Minimally, according to respondent, the trial court had to give the parties and their counsel notice of the ex parte communications and disclose to them the substance of the communications. Respondent then shifts gears, maintaining that there was an appearance of impropriety because of the federal lawsuit against the court. Respondent posits that "[r]easonable minds would and could question whether the judge's ability to carry out judicial responsibilities with integrity, impartiality, and competence is impaired when adjudging the legal actions of a party who has sued the judge in her official capacity in another court." And thus there was an appearance of impropriety in the form of a conflict of interest. Respondent requests a decision reversing the denial of disqualification, vacating the trial court's ruling on the PPO, and remanding the case to "a non-conflicted judicial officer."

### 2.  STANDARDS OF REVIEW

This Court reviews for an abuse of discretion a trial court's factual findings regarding a motion for disqualification while its application of the facts to the law is reviewed de novo. *In re MKK*, 286 Mich App 546, 564; 781 NW2d 132 (2009). "An abuse of discretion occurs when the trial court's decision is outside the range of reasonable and principled outcomes." *Id*. (quotation marks and citation omitted).

### 3.  DISCUSSION

Due process requires that an unbiased and impartial decision-maker hear and decide a case. *Mitchell v Mitchell*, 296 Mich App 513, 523; 823 NW2d 153 (2012). But "[a] trial judge is presumed unbiased, and the party asserting otherwise has the heavy burden of overcoming the presumption." *Id*.; see also *Cain v Dep't of Corrections*, 451 Mich 470, 497; 548 NW2d 210 (1996). Various nonexclusive grounds for disqualification are set forth in MCR 2.003(C), which provides, in relevant part:

> (1) Disqualification of a judge is warranted for reasons that include, but are not limited to, the following:
>
> (a) The judge is biased or prejudiced for or against a party or attorney.
>
> (b) The judge, based on objective and reasonable perceptions, has either (i) a serious risk of actual bias impacting the due process rights of a party as enunciated in *Caperton v Massey*, [556 US 868]; 129 S Ct 2252; 173 L Ed 2d 1208 (2009), or

-8-

(ii) has failed to adhere to the appearance of impropriety standard set forth in Canon 2 of the Michigan Code of Judicial Conduct.  [Alteration in original.[11]]

Disqualification is also warranted when a judge has more than a "de minimis interest that could be substantially affected by the proceeding[.]"  MCR 2.003(C)(1)(g)(iii).  "[J]udicial rulings, in and of themselves, almost never constitute a valid basis for a motion alleging bias, unless the judicial opinion displays a 'deep-seated favoritism or antagonism that would make fair judgment impossible and overcomes a heavy presumption of judicial impartiality.' " *Armstrong v Ypsilanti Charter Twp*, 248 Mich App 573, 597; 640 NW2d 321 (2001), quoting *Cain*, 451 Mich at 496.  In fact, "a trial judge's remarks made during trial, which are critical of or hostile to counsel, the parties, or their cases, ordinarily do not establish disqualifying bias." *In re MKK*, 286 Mich App at 567.  An appearance of impropriety may arise when the conduct of a judge "would create in reasonable minds a perception that the judge's ability to carry out judicial responsibilities with integrity, impartiality and competence is impaired." *Caperton*, 556 US at 888 (quotation marks and citation omitted).[12]

In this case, one of the reasons the trial court gave for denying the motion for disqualification was that respondent's motion was untimely.  MCR 2.003(D)(1)(a) provides, in part, that "[t]o avoid delaying trial and inconveniencing the witnesses, all motions for disqualification *must* be filed within 14 days of the discovery of the grounds for disqualification." (Emphasis added.)  Indeed, respondent's motion was filed nearly three months after the federal litigation was commenced.  And, at the latest, the grounds for disqualification would have been discovered immediately upon filing the suit.  On appeal, respondent fails entirely to address this basis for the trial court's ruling.  "When an appellant fails to dispute the basis of a lower court's ruling, we need not even consider granting the relief being sought by the appellant." *Denhof v*

---

[11] Canon 2(A) provides:

> Public confidence in the judiciary is eroded by irresponsible or improper conduct by judges. A judge must avoid all impropriety and appearance of impropriety. A judge must expect to be the subject of constant public scrutiny. A judge must therefore accept restrictions on conduct that might be viewed as burdensome by the ordinary citizen and should do so freely and willingly.

[12] The *Caperton* Court noted:

> The Due Process Clause demarks only the outer boundaries of judicial disqualifications. Congress and the states, of course, remain free to impose more rigorous standards for judicial disqualification than those we find mandated here today. Because the codes of judicial conduct provide more protection than due process requires, most disputes over disqualification will be resolved without resort to the Constitution.  [*Id.* at 889-890 (quotation marks and citation omitted).]

Due process rights are implicated when the probability of actual bias by the judge is too high to be constitutionally tolerable. *Id.* at 872.

*Challa*, 311 Mich App 499, 521; 876 NW2d 266 (2015). For this reason alone, respondent's demand for disqualification fails. But we nonetheless continue with the analysis.

Consistent with the chief judge's observations below, our Supreme Court in *Grievance Administrator v Fieger*, 476 Mich 231, 274; 719 NW2d 123 (2006), remarked:

> Indeed, if anyone can force a judge's disqualification merely by suing that judge, then any litigant would have an easy method of judge-shopping, eliminating disfavored judges until the desired judge has been obtained. The destructive effect of such a rule is too obvious to require further elaboration.

The Supreme Court of our sister state Ohio likewise stated as follows in *In re Disqualification of Saffold*, 155 Ohio St 3d 1272, 1272-1273; 121 NE3d 387 (2018):

> It is well established that a judge will not be disqualified solely because a litigant in a case pending before the judge has filed a lawsuit against that judge. To hold otherwise would invite parties to file lawsuits solely to obtain a judge's disqualification, which would severely hamper the orderly administration of judicial proceedings. . . . .

> [I]n general, suing a judge does not create legitimate grounds for disqualification when the judge has been sued as a result of her rulings in the case. [Quotation marks and citations omitted.[13]]

And in *Olsen v Wainwright*, 565 F2d 906, 907 (CA 5, 1978), the Fifth Circuit for the United States Court of Appeals ruled:

> Petitioner next alleges that where the trial judge had been named as a defendant in a federal civil suit filed by petitioner, the judge's refusal to disqualify himself violated petitioner's due process rights. No evidence is presented that the judge conducted the trial in a biased manner, or that the proceedings were in any way affected by the civil suit. The failure of the judge to disqualify himself under these circumstances was not error.

In this case, there was no indication that the trial court acted in a biased or less than impartial manner. The court began the evidentiary hearing on respondent's motion to terminate the PPO, allowed respondent a number of his requested adjournments, and ultimately terminated those aspects of the PPO related to stalking under MCL 750.411h and MCL 750.411i for lack of evidence. The trial court did not prevent respondent from presenting his side of the matter, and respondent chose not to testify. It is true that the court refused to allow respondent to withdraw his motion to terminate the PPO. A trial court, however, has the inherent authority to exercise its

---

[13] See also *Tennant v Marion Health Care Foundation, Inc*, 194 W Va 97, 109 n 10; 459 SE2d 374 (1995) ("If the disqualification of every judge who is sued in his or her official capacity was required, it would have a substantial impact on available judicial resources.").

discretion in controlling its docket. *Baynesan v Wayne State Univ*, 316 Mich App 643, 645; 894 NW2d 102 (2016). Respondent couched the notice of withdrawal in terms that reserved a right to refile the motion to terminate the PPO in the future, which was not a "right" that respondent could dictate to the court.[14] Considering this problematic characteristic of the notice of withdrawal, along with the facts that the hearing was already underway and several adjournments had been granted, we cannot conclude that the trial court's decision to disallow withdrawal of the motion reflected actual bias against respondent. The trial court's ruling on the matter did not evidence deep-seated favoritism or antagonism that would make fair judgment impossible—it was simply a judicial ruling. *Armstrong*, 248 Mich App at 597.

With respect to Canon 3(A)(4), which, again, provides that "[a] judge shall not initiate, permit, or consider ex parte communications, or consider other communications made to the judge outside the presence of the parties concerning a pending or impending proceeding, except as follows . . .," we note it did not compel recusal or require a disclosure of communications in this case.[15] We initially note that respondent fails to address the trial court's ruling relying on the exception to Canon 3(A)(4) found in subdivision (A)(4)(e) of Canon 3 regarding ex parte communications that are expressly authorized by law. As stated earlier, such a briefing failure alone provides a reason to reject respondent's argument on appeal. *Denhof*, 311 Mich App at 521. Furthermore, were we to accept respondent's argument, it would effectively vitiate the principle that a person cannot force a judge's disqualification merely by suing that judge.

Additionally, as the chief judge observed, there was no evidence that there were ex parte communications between the trial court and the court's counsel in the federal action concerning the pending PPO litigation involving petitioner and respondent. The federal lawsuit regards the constitutionality of the PPO statute, which would not necessarily require a discussion by the court and its counsel about the particular aspects of the instant PPO case.[16]

In sum, respondent fails to persuade us that the trial court or the chief judge committed error requiring reversal with respect to respondent's motion seeking disclosure of ex parte communications or to disqualify the court.

---

[14] A motion to terminate a PPO must be filed within 14 days of service of the PPO or upon a showing of good cause for a later filing. MCR 3.707(A)(1)(b).

[15] Respondent's argument about the court's having to give notice to the parties and disclose ex parte communications is based on the language in Canon 3(A)(4)(a)(ii). Although the language in this provision does demand notification and disclosure of ex parte communications, it is only implicated when a judge "allow[s] ex parte communications for scheduling, administrative purposes, or emergencies that do not deal with substantive matters or issues on the merits[.]" Canon 3(A)(4)(a). There is no evidence or claim of such communications. Accordingly, the legal premise of respondent's position completely evaporates.

[16] To the extent that respondent claims a conflict of interest independent from his assertion of an appearance of impropriety, he has failed to show an interest by the court in the petitioner and respondent's PPO litigation that would be substantially affected by the federal lawsuit.

## B. PPO ENJOINING DEFAMATORY SPEECH ON SOCIAL MEDIA

### 1. RESPONDENT'S ARGUMENTS

Respondent argues that the nondomestic PPO statute, MCL 600.2950a, does not bar or provide a remedy for defamation. Respondent contends that he believed that LW's testimony in the child custody proceeding referred to petitioner and not another individual with the same first name, that respondent did not direct publication to third parties, and that he did not republish LW's testimony on social media negligently. Therefore, according to respondent, he did not commit a written defamation through any of his posts and his speech was thus constitutionally protected under the First Amendment. Respondent further maintains that the amended PPO constituted an unconstitutional prior restraint. Additionally, respondent asserts that if he defamed petitioner, MCL 600.2911 would be implicated, giving petitioner a cause of action for money damages but not the right to petition for a PPO.[17] Respondent finally claims that equity will not enjoin a defamation absent economic injury, which did not occur here.

### 2. STANDARDS OF REVIEW

We review for an abuse of discretion a trial court's decision regarding whether to issue a PPO. *Hayford v Hayford*, 279 Mich App 324, 325; 760 NW2d 503 (2008). A trial court abuses its discretion when its decision falls outside the range of reasonable and principled outcomes. *Id*. A court necessarily abuses its discretion when it makes an error of law. *TM v MZ (On Remand)*, 326 Mich App 227, 235-236; 926 NW2d 900 (2018). Factual findings underlying a PPO ruling are reviewed for clear error. *Hayford*, 279 Mich App at 325. This Court reviews de novo constitutional issues. *Winkler v Marist Fathers of Detroit, Inc*, 500 Mich 327, 333; 901 NW2d 566 (2017). Matters of statutory construction are also subject to de novo review. *TM*, 326 Mich App at 236.

### 3. RULES OF STATUTORY CONSTRUCTION

In *Whitman v City of Burton*, 493 Mich 303, 311-312; 831 NW2d 223 (2013), the Michigan Supreme Court articulated the principles governing the interpretation of a statute:

> When interpreting a statute, we follow the established rules of statutory construction, the foremost of which is to discern and give effect to the intent of the Legislature. To do so, we begin by examining the most reliable evidence of that intent, the language of the statute itself. If the language of a statute is clear and unambiguous, the statute must be enforced as written and no further judicial construction is permitted. Effect should be given to every phrase, clause, and word in the statute and, whenever possible, no word should be treated as surplusage or

---

[17] MCL 600.2911 provides for money damages in a suit for libel or slander and sets forth various parameters depending on the type of defamation involved. MCL 600.2911(7) states that "[a]n action for libel or slander shall not be brought based upon a communication involving a private individual unless the defamatory falsehood concerns the private individual and was published negligently."

rendered nugatory. Only when an ambiguity exists in the language of the statute is it proper for a court to go beyond the statutory text to ascertain legislative intent. [Citations omitted.]

## 4. DISCUSSION

MCL 600.2950 concerns PPOs involving current or former spouses, individuals in dating relationships, and housemates, while MCL 600.2950a, the nondomestic PPO statute pertinent here, addresses stalking behavior or conduct that is not limited to certain existing relationships. Except as otherwise provided in MCL 600.2950 and MCL 600.2950a, an action for a PPO is governed by the Michigan Court Rules, with MCR 3.701 *et seq.*, applying to PPOs against adults. MCR 3.701(A). "The petitioner bears the burden of establishing reasonable cause for issuance of a PPO." *Hayford*, 279 Mich App at 326. A respondent may file a motion to terminate or modify a PPO. MCR 3.707(A)(1)(b); MCL 600.2950a(13). The burden of proof remains with a petitioner who seeks to establish "a justification for the continuance of a PPO at a hearing on the respondent's motion to terminate the PPO . . . ." *Hayford*, 279 Mich App at 326.

MCL 600.2950a(1) provides:

[A]n individual may petition the family division of circuit court to enter a personal protection order to restrain or enjoin an individual from engaging in conduct that is prohibited under section 411h, 411i, or 411s of the Michigan penal code, 1931 PA 328, MCL 750.411h, 750.411i, and 750.411s. A court shall not grant relief under this subsection unless the petition alleges facts that constitute stalking as defined in section 411h or 411i, or conduct that is prohibited under section 411s . . . . Relief may be sought and granted under this subsection whether or not the individual to be restrained or enjoined has been charged or convicted under section 411h, 411i, or 411s of the Michigan penal code. . . . .

MCL 750.411h concerns stalking and MCL 750.411i pertains to aggravated stalking. MCL 750.411h and MCL 750.411i are no longer pertinent in this case because the trial court discarded aspects of the PPO connected to those two statutory provisions. On the other hand, MCL 750.411s is relevant and provides, in pertinent part, as follows:

(1) A person shall not post a message through the use of any medium of communication, including the internet or a computer, computer program, computer system, or computer network, or other electronic medium of communication, without the victim's consent, if all of the following apply:

(a) The person knows or has reason to know that posting the message could cause 2 or more separate noncontinuous acts of unconsented contact with the victim.

(b) Posting the message is intended to cause conduct that would make the victim feel terrorized, frightened, intimidated, threatened, harassed, or molested.

(c) Conduct arising from posting the message would cause a reasonable person to suffer emotional distress and to feel terrorized, frightened, intimidated, threatened, harassed, or molested.

(d) Conduct arising from posting the message causes the victim to suffer emotional distress and to feel terrorized, frightened, intimidated, threatened, harassed, or molested.

As defined in MCL 750.411s(8)(i), to "post a message" means "transferring, sending, posting, publishing, disseminating, or otherwise communicating or attempting to transfer, send, post, publish, disseminate, or otherwise communicate information, *whether truthful or untruthful*, about the victim." (Emphasis added.) And as indicated earlier, MCL 750.411s "does not prohibit constitutionally protected speech or activity." MCL 750.411s(6).

When MCL 600.2950a is considered in conjunction with MCL 750.411s, it becomes clear that in order to be entitled to a PPO, a petitioner must establish that the respondent engaged in conduct that involved posting a message on the Internet or a computer without the petitioner's consent and that the four elements found in subdivisions (a) through (d) of MCL 750.411s(1) are all satisfied. "[T]o prohibit postings under MCL 750.411s, there must be a determination that the postings in questions violate the elements set forth in the statute." *Buchanan v Crisler*, 323 Mich App 163; 922 NW2d 886, 896 (2018). The *Buchanan* panel, discussing MCL 750.411s, explained:

[I]t appears that the statute is designed to prohibit what some legal scholars have referred to as "cyberstalking by proxy" or "cyberharassing by proxy." In other words, as made plain by the statute, it is not the postings themselves that are harassing to the victim; rather, it is the unconsented contacts arising from the postings that harass the victim. In particular, the statute envisions a scenario in which a stalker posts a message about the victim, without the victim's consent, and as a result of the posting, others initiate unconsented contacts with the victim. These unconsented contacts, arising from the stalker's postings, result in the harassment of the victim. In this manner, by posting a message that leads to unconsented contact, the stalker is able to use other persons to harass the victim.

For example, there have been cases of cyberstalking by proxy in which a stalker posts messages with sexual content about the victim and suggests that the victim is interested in sexual contact. In that situation, third parties read the message and contact the victim, expecting sex. In a somewhat more benign example, in a Massachusetts case, harassers posted false advertisements online, suggesting that the victims had something for sale or to give away for free; as a result of these advertisements, the victims received numerous phone calls and visits at their home about the items. In each of these cases, the victim was harassed by the unconsented contacts that arose from the online postings. As written, MCL 750.411s is designed to address situations in which the victim is harassed by conduct arising from the posts. [*Id.* at 895-896 (citations omitted).]

-14-

Once the elements of MCL 750.411s are established, the PPO issued by a trial court under MCL 600.2950a must indicate that it restrains or enjoins the respondent from engaging in further conduct prohibited by MCL 750.411s. MCL 600.2950a(1).

With respect to the elements listed in MCL 750.411s, the trial court ruled that petitioner had demonstrated reasonable cause to continue the PPO because the requirements of the statute had been satisfied. On appeal, respondent does not challenge the court's determination that the elements in MCL 750.411s had been established by petitioner. Again, taking MCL 750.411h and MCL 750.411i out of the equation, engagement in conduct prohibited by MCL 750.411s had to be shown to justify the issuance of a PPO pursuant to MCL 600.2950a. Because respondent fails to take issue with the trial court's ruling on the elements of MCL 750.411s, we will not explore the issue, and the court's decision stands. Respondent's position is that the amended PPO violates the First Amendment and that there was no defamation that would remove the case from the protection of the First Amendment.

According to the language of MCL 750.411s(8)(i), posted messages can be prohibited even if they are truthful, but by the same token MCL 750.411s cannot be read to prohibit constitutionally protected speech, MCL 750.411s(6). In *TM*, 326 Mich App at 237-238, this Court addressed the constitutional implications of a PPO issued under MCL 750.411s, stating:

> The First Amendment, applicable to the States through the Fourteenth Amendment, provides that Congress shall make no law abridging the freedom of speech. The United States Supreme Court has held that the federal constitution protects speech over the Internet to the same extent as speech over other media. However, the right to speak freely is not absolute. For example, libelous utterances are not within the area of constitutionally protected speech, and a state may therefore enact laws punishing them.
>
> Prohibitions relating to content, however, are few, because of the First Amendment's "bedrock principle" that an idea cannot be prohibited simply because society finds the idea itself offensive or disagreeable. The government may not regulate speech based on hostility—or favoritism—towards the underlying message expressed. The First Amendment permits restrictions upon the content of speech in a few limited areas, which are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality. Thus, the First Amendment does not protect obscenity or defamation, within certain limits. A State may punish those words which by their very utterance inflict injury or tend to incite an immediate breach of the peace, including "fighting words," "inciting or producing imminent lawless action," and "true threats." [Quotation marks, citations, alterations, and ellipses omitted.]

Again, the Unites States Constitution does not protect defamatory speech. *Id.* at 240. A defamatory communication is a communication that tends to harm a person's reputation, thereby lowering her in the estimation of the community or deterring others from dealing or associating with her. *Id.* at 240-241. A defamatory statement is a statement asserting facts that are and can be proven false. *Id.* at 241. Statements that are not protected by the First Amendment include

-15-

false statements of fact, which are those that state actual facts but are objectively provable as false, along with direct accusations or inferences of criminal conduct. *Buchanan*, 922 NW2d at 897. Accusations of criminal activity are considered defamation per se under the law without the need to prove damages to a plaintiff's reputation. *TM*, 326 Mich App at 241.

At the evidentiary hearing on the motion to terminate the PPO, petitioner testified that respondent posted—on multiple public Facebook pages—petitioner's photograph, her name, and factual assertions that petitioner was helping a sexual predator, LW, by allowing him to have contact with and access to OGL. Petitioner stated that these assertions were false and that she had never even met or communicated with LW, let alone provide him assistance in any form or fashion. Petitioner testified that the offending Facebook pages included "Justice for [OGL]," which was created by respondent and had over 1,000 members, an attorney review page, a Port Huron page, and a Facebook page respondent created by using a false name. Petitioner explained that LW had testified in a child custody hearing and referenced a person with the same first name as petitioner, that the transcript of the hearing revealed that this person was LW's nephew's wife and not petitioner, and that respondent knew full well that it was not a reference to petitioner. Petitioner testified that the social media postings placed her employment as a sign language interpreter in jeopardy.

The trial court did not err by concluding that respondent made defamatory statements concerning petitioner on the various Facebook pages. Respondent's posts on social media effectively asserted that petitioner was allowing LW, a convicted sex offender, to have ongoing access to OGL. This statement constituted a factual assertion that could be and was proven false. Respondent's claim that he believed that LW's testimony in the child custody proceeding concerned petitioner is disingenuous. The transcript itself revealed that "T" was LW's nephew's wife, petitioner informed respondent multiple times that she had never met or communicated with LW, and even the transcript references to "T" did not show that "T" was facilitating access to OGL by LW. There was simply no truth whatsoever in respondent's Facebook posts regarding the actions and conduct of petitioner. Furthermore, contrary to respondent's arguments, the Facebook posts were published to third parties, as the page "Justice for [OGL]" alone had over 1,000 members. And the factually inaccurate Facebook posts were, minimally, the result of respondent's negligence, if not his intentional misconduct, in light of the evidence that the child custody transcripts did not refer to petitioner and did not even indicate that "T" allowed LW access to OGL.

Moreover, although MCL 600.2911 provides for money damages for defamation, this does not mean, as claimed by respondent, that it precludes enjoining defamatory communications that satisfy the elements of MCL 750.411s. Nothing in the plain and unambiguous of MCL 600.2911 allows for such a construction. With respect to respondent's argument that MCL 600.2950a does not bar or provide a remedy for defamation, we conclude that it reflects a fundamental misunderstanding of MCL 600.2950a and its incorporation of MCL 750.411s. As discussed earlier, under MCL 600.2950a(1), a court may enjoin a person from engaging in conduct that violates MCL 750.411s, but this relief can only be granted if it is alleged and shown that the respondent violated MCL 750.411s. The issue of defamation only serves as a possible argument by a PPO petitioner when a respondent raises a claim that the requested PPO would violate his or her First Amendment rights.

We also note that truthful communications or posts can rise to the level of a violation of MCL 750.411s, and in turn be prohibited by a PPO under MCL 600.2950a, without infringing on a respondent's constitutional rights. In *Buchanan*, 922 NW2d at 897, this Court explained:

> Although statements that are defamatory are not protected under the First Amendment, it does not follow that truth is a defense to a PPO prohibiting postings that violate MCL 750.411s. Quite simply, [the respondent's] defamation arguments lack merit for the simple reason that defamation is not the only type of speech exempted from First Amendment protections. And in this case, the trial court did not prohibit [the respondent's] speech because it had concluded that [he] defamed [the petitioner]. Rather, the trial court entered a PPO to prevent [the respondent] from posting a message in violation of MCL 750.411s. Under MCL 750.411s(8)(i), the truthfulness of the messages is irrelevant to whether [the respondent] violated the statute.

The *Buchanan* panel discussed the speech-integral-to-criminal-conduct exception to the First Amendment, which has been recognized in relation to criminal stalking statutes. *Id.* at 898. The Court observed that it is not deemed an abridgment of freedom of speech to make a course of conduct unlawful merely because the conduct entails the use of the written, printed, or spoken word, as is involved in stalking provisions. *Id.* This Court recognized the conundrum created by the speech-integral-to-criminal-conduct exception, considering that MCL 750.411s, a stalking statute, contains a provision that it does not prohibit constitutionally protected speech, MCL 750.411s(6), which would be rendered meaningless if all violations of MCL 750.411s triggered the speech-integral-to-criminal-conduct exception. *Id.* at 899-900. The *Buchanan* panel, after reviewing decisions from various jurisdictions, came to the following resolution:

> When these various cases are read together, it becomes clear that while messages posted to harass a private individual may be enjoined, cyberstalking laws may not be used to restrict speech that relates to a public figure or matters of public concern. We find these cases persuasive, and we hold that when the argument is raised that MCL 750.411s is being used to prohibit constitutionally protected speech relating to a matter of public concern, it must be determined whether the postings are intended solely to cause conduct that will harass a private victim in connection with a private matter or whether the publication of the information relates to a public figure and an important public concern. [*Id.* at 900 (citations omitted).]

Here, petitioner is a private victim and, perhaps arguably, respondent's postings regarded a private matter and not a matter of public concern. Under such circumstances, the speech-integral-to-criminal-conduct exception to the First Amendment would apply, rendering the truthfulness of respondent's posts irrelevant. Nevertheless, unlike the circumstances in *Buchanan*, petitioner raised defamation in response to respondent's assertion that his First Amendment rights were being violated, not the speech-integral-to-criminal-conduct exception. Therefore, our ruling is restricted to defamation and not the speech-integral-to-criminal-conduct exception to the First Amendment, which was not addressed below. And, again, the trial court did not err in ruling that petitioner established that respondent's posts were defamatory. But we must still examine respondent's argument concerning prior restraints.

The *TM* panel addressed enjoining future defamatory statements and the doctrine of prior restraints, stating:

> The term "prior restraint" is used to describe administrative and judicial orders forbidding certain communications when issued in advance of the time that such communications are to occur. Temporary restraining orders and permanent injunctions—i.e., court orders that actually forbid speech activities—are classic examples of prior restraints. Such restrictions are distinguishable from punishment arising from past speech that has been adjudicated as criminal. Because injunctions carry greater risks of censorship and discriminatory application than do general ordinances, they require a somewhat more stringent application of general First Amendment principles. Any prior restraint of expression bears a heavy presumption against its constitutional validity.
>
> [W]hether and under what circumstances a court in Michigan is permitted to enjoin defamation has not been considered by this Court in a published decision since 1966, in *McFadden v Detroit Bar Ass'n*, 4 Mich App 554; 145 NW2d 285 (1966). In that case, a panel of this Court held that "it is a familiar and well-settled rule of American jurisprudence that equity will not enjoin a defamation, absent a showing of economic injury . . . ." *Id.* at 558. The *McFadden* Court stated that the primary reason for refusing to do so was "an abhorrence of previous restraints on freedom of speech," but acknowledged other reasons, including that there is "an adequate remedy at law, i.e., an action for damages, and that the defendant in a defamation action has the right to a jury trial which would be precluded by granting of an injunction." *Id.*
>
> Contrary to *McFadden*, there is a modern trend toward allowing injunctions of defamatory speech. That modern trend, though, first requires a determination by a fact-finder that the statements were definitively false and then specifically limits any injunction to the adjudicated speech. As discussed, the trial court failed to make such a determination in this case. Therefore, regardless of whether the modern trend or the rule announced in *McFadden*, 4 Mich App at 558, is adopted, the issuance of the PPO here, because of the trial court's failure to determine that the speech actually was false, fails to overcome the heavy presumption against its constitutional validity. [*TM*, 326 Mich App at 244-246 (quotation marks and citations omitted; ellipses in original).]

"Numerous courts, both federal and state, have held that a trial court may enjoin a defendant from making defamatory speech after there has been a determination that the speech was, in fact, false." *TM*, 326 Mich App at 246 n 6 (the panel cited numerous supporting opinions from other jurisdictions).

In this case, while petitioner was worried about the possibility of economic injury, there was no evidence that she actually suffered economic injury. That said, *McFadden* was issued in 1967 by this Court and is not binding precedent. MCR 7.215(J)(1). Moreover, *McFadden* concerned a straightforward equitable request for injunctive relief and was not couched within the context of a stalking statute that required the establishment of several culpability elements. If the

elements of MCL 750.411s have been satisfied for purposes of obtaining a PPO under MCL 600.2950a and if the respondent has asserted that his or her posted messages constituted constitutionally protected speech, we see no valid reason for demanding proof of economic injury where the petitioner can otherwise establish that the posts were false and defamatory. Ultimately, MCL 750.411s, as applied through MCL 600.2950a, concerns the enjoinment of cyberstalking, not defamation. We thus choose to apply the modern trend and conclude that when a respondent challenges a request for a PPO on the basis that the PPO would prohibit constitutionally protected speech and the petitioner counters that the posted messages are defamatory, the petitioner need not show economic injury.

Consistent with the modern trend, the trier of fact must determine that the statements or posts were definitively false. The trial court here did so, and its ruling was supported by the evidence. But to also be consistent with the modern trend, the PPO needs to be specifically limited to the adjudicated speech. In this case, the amended PPO prohibited respondent "from posting defamatory statements about [p]etitioner on social media and/or from publishing such statements elsewhere." This language is much too broad and unconfined to the boundaries set in MCL 750.411s. The trial court should have amended the PPO to provide that, absent petitioner's consent, respondent is prohibited from posting online messages which assert that petitioner is allowing LW to have access to or contact with OGL and which otherwise violate MCL 750.411s.

III. CONCLUSION

We hold that there was no error in denying respondent's motion that sought disclosure of alleged ex parte communications between the trial court and the court's counsel in the federal suit and that sought recusal or disqualification of the trial court. We further hold that the amended PPO was inconsistent with the law and must be further modified as outlined above.[18]

We affirm in part and reverse and remand in part for proceedings consistent with this opinion. We do not retain jurisdiction. Neither party having fully prevailed on appeal, we decline to tax costs under MCR 7.219.

/s/ Jane E. Markey
/s/ Mark T. Boonstra
/s/ Karen M. Fort Hood

---

[18] Of course, if no PPO is currently in place, a modified active or operative PPO cannot be issued unless petitioner seeks to reestablish a PPO. We are unsure whether further amendment of the PPO for purposes of changing the prior LEIN entry is feasible, as compared to the act of rescinding a PPO, and we shall leave it to the trial court on remand to explore that matter. If the amended PPO was continued or remains in effect, it shall be modified consistent with our holding.

-19-